In re NORTH ATLANTIC MILLWORK CORP., d/b/a NAMCO, Debtor.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

DOORCRAFTERS (MI of VT), Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

JUST CABINETS, INC., Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

MARVIN LUMBER & CEDAR CO., Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

ODL, INC., Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

SETZER FOREST PRODUCTS, Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

STANLEY DOOR SYSTEMS, Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

VISADOR COMPANY, Defendant.

FLEET NATIONAL BANK and Fleet Credit Corporation, Plaintiffs,

v.

WOODFOLD–MACRO MANUFACTURING, Defendant.

Bankruptcy No. 91–11537–JNF.

Adv. Nos. 92–1476, 92–1478 to 92–1482, 92–1484 and 92–1485.

United States Bankruptcy Court, D. Massachusetts.

May 26, 1993.

---

Daniel J. Hammond, Brown Rudnick Freed & Gesmer, Boston, MA, for Fleet Nat. Bank and Fleet Credit Corp.

Molly Cochran, Sullivan & Worcester, Boston, MA, for Doorcrafters (MI of VT).

David Q. Whittier, P.A., South Paris, ME, for Just Cabinets, Inc.

Gene K. Landy, Shapiro, Israel & Weiner, P.C., Boston, MA, for Marvin Lumber & Cedar Co.

David I. Shorr, Framingham, MA, for ODL, Inc.

Walter M. Lupan, Brooks & Lupan, Sherborn, MA, for Setzer Forest Products.

John S. Rodman, Parker, Coulter, Daley & White, Boston, MA, for Stanley Door Systems.

Jillian Aylward, Kahn & McKenzie, Boston, MA, and Michael G. Tanner, Kirschner, Main, Petrie, Graham & Tanner, Jacksonville, FL, for Visador Co.

John S. Rodman, Parker, Coulter, Daley & White, Boston, MA, for Woodfold–Marco Mfg. Co.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

Eight motions to dismiss arising from eight separate preference complaints commenced by Fleet National Bank and Fleet Credit Corporation (collectively "Fleet") are before the Court. Fleet commenced the above-captioned adversary proceedings as a result of borrowing orders entered by the late Bankruptcy Judge James N. Gabriel and particularly an "Order Approving Sale of all Debtor's Assets Free and Clear of Liens, Claims and Encumbrances," entered by Bankruptcy Judge James A. Goodman, sitting by designation, while this case was a case under Chapter 11. A review of the procedural posture and background of the case follows.

## II. FACTS

North Atlantic Millwork Corp. d/b/a NAMCO (the "Debtor") filed a voluntary Chapter 11 petition on February 26, 1991. Several days later, on March 1, 1991, the Debtor filed an "Emergency Motion of Debtor for Entry of Agreed Order Approving Borrowing." The motion was served upon the Debtor's 19 largest unsecured creditors (Bark Realty was served twice at two separate addresses), including four of the defendants (Marvin Window [sic], Coffman Stair Parts/Visador [sic], ODL Inc. and Doorcrafters (Michigan of VT. [sic]). The Court scheduled an emergency hearing for March 5, 1991, and the Debtor gave the same 19 creditors notice by fax of the time and place of the emergency hearing.

The Court entered an "Agreed Interim Order Approving Postpetition Borrowing, Security and Use of Cash Collateral" on March 5, 1991. The Court scheduled a second hearing to consider the motion and a final borrowing order for March 27, 1991. The Debtor, on March 6, 1991, gave notice of that hearing to 20 unsecured creditors, including three of the defendants. Doorcrafters was eliminated from the certificate of service filed in conjunction with the March 27th hearing.

The "Final Agreed Order Approving Postpetition Borrowing, Security and Use of Cash Collateral" (the "Borrowing Order") was entered on March 27, 1991. The Borrowing Order set forth the Debtor's acknowledgment that it was obligated to Fleet on account of loans and lease financing in the following amounts:

| | |
|---|---|
| $3,884,187.03 | (unpaid principal balance of loans) |
| $ 126,210.89 | (lease balance) |
| $ 104,726.60 | (unpaid accrued interest and over-advance fees on loans) |
| Total $4,115,124.52 | |

To secure payment and performance of the Debtor's prepetition and postpetition obligations, paragraph 7 of the Borrowing Order provided the following:

To secure payment and performance of all Prepetition Obligations and Postpetition Obligations, whether now existing or hereafter arising, and all obligations arising under this Order, and to provide Fleet with adequate protection of its in-

terest in the property to be used, sold, leased, or otherwise disposed of by the Debtor prior to the Termination Date under the terms of this Order (including, without limitation, coverage as to the amount of any loss, damages, depletion or depreciation resulting from the Debtor's use (or in the case of inventory, sale) of such property), *Fleet is hereby granted,* effective as of the commencement of this case, irrespective of any limitations contained in the Prepetition Financing Documents, *a first and paramount lien,* (subject only to any purchase money liens which have priority over Fleet's lien under applicable non-bankruptcy law duly perfected prior to the commencement of this case and subject to the terms of paragraph 12 hereof, and duly perfected prepetition liens on motor vehicles), *in and to all existing and hereafter acquired property* of the Debtor's estate, of whatever kind or nature, real or personal, whether acquired prepetition or postpetition, *including,* without limitation and by way of general description only, all real estate interests; all interests under leases, licenses or occupancy agreements covering personal or real property, including all store leases; all motor vehicles; all accounts and accounts receivable; all franchise agreements, contracts, contract rights, trademarks and patents and other general intangibles; all deposit accounts, including, without limitation, those maintained with Fleet; instruments; documents; chattel paper; all loan proceeds; all other obligations in whatever form owing to the Debtor, and all rights in the merchandise or services which give rise to any of the foregoing; all inventory, including, without limitation, store merchandise, raw materials, work in process, finished goods and other personal property held for lease or sale or to be furnished under contracts for service, or to be consumed in the Debtor's business, all machinery, equipment, furniture, furnishings, fix-

tures and other personal property acquired for use primarily in the Debtor's business; all causes of action, whether arising in contract, tort, or otherwise; all collateral as defined in the Prepetition Financing Documents; and *all property acquired, created, or recovered by the Debtor, or any trustee of the Debtor, whether from operations, or as a result of actions successfully maintained under Sections 543, 550, or 551; and all proceeds and products thereof, whether cash or non-cash* (the "Postpetition Collateral").

(emphasis supplied). No objections were filed either to the motion or to the proposed Borrowing Order prior to March 27, 1991.

On March 27, 1991, the Creditors' Committee filed a motion to employ counsel.[1] The motion was allowed on April 1, 1991. On May 6, 1991, the Debtor filed a "Non–Adversarial Motion of Debtor for Approval of Amendment to Final Agreed Order Approving Post–Petition Borrowing, Security and Use of Collateral." The motion was signed by counsel to the Debtor, Fleet, Jeld–Wen, Inc. ("Jeld–Wen") and the Creditors' Committee. It was allowed on May 7, 1991. This was the first of a series of motions to amend the Borrowing Order that were filed with the Creditors' Committee's endorsement and approval between May 6, 1991 and April 13, 1992.

On April 8, 1992, this Court issued an order to show cause why the case should not be dismissed, converted to Chapter 7 or a Chapter 11 trustee appointed and scheduled a hearing for May 5, 1992. The order and notice of the hearing date were served upon all creditors appearing on the matrix, including ODL, Inc., Marvin Window [sic] (at three different addresses), Just Cabinets, Inc., Doorcrafters, and Visador Pa. Div. [sic]. On May 5, 1992, the Court continued the show cause hearing until May 28, 1992 at 9:00 a.m., in light of the filing of a "Joint Motion to Sell All Assets Free and Clear of Liens, Claims, and Encumbrances" (the "Joint Motion to Sell"), by the Debtor, Fleet, Jeld–Wen and the Credi-

---

1. Bend Millwork Systems, Inc., Dorris Lumber and Molding Company and Visador Company were selected from the unsecured creditors to serve on the committee.

tors' Committee, which the Court also scheduled to be heard on that day.[2]

On May 6, 1992, a copy of the Court's Procedural Order and Notice of Intended Sale was served by Debtor's counsel upon the service list which contained the names and addresses of over 400 creditors or parties in interest, including five of the defendants. However, Setzer Forest Products, Stanley Door Systems and Woodfold–Macro Manufacturing Co. were not given notice of the sale, or, for that matter, notice of the Borrowing Order or any amendments to it, presumably because they were not creditors of the Debtor at the time of the commencement of the case.

The Procedural Order advised creditors of the filing of a motion to sell and that copies of additional documents could be obtained from Debtor's counsel. The Asset Purchase Agreement, between the Debtor and North Atlantic Millwork Acquisition Corp ("Acquisition Corp."), which could have been obtained from Debtor's counsel, defined the term "Purchased Assets" to include "all potential claims and causes of action under Sections 547, 548, 549 and 550 of the Bankruptcy Code relating to the Seller in the Chapter 11 case." No further elaboration was provided in the document.

Motorlease Corporation, Bark Realty and Doane & Williams, Inc. filed objections to the Joint Motion to Sell. Accordingly, the Court conducted a hearing on May 28, 1992. At the hearing, counsel to the Debtor confirmed that a twenty day notice was given to all listed creditors. The objections to the sale, though not formally withdrawn on the record, were not pressed. The Debtor, through counsel, made an offer of proof and agreed to several modifications of the proposed order approving the sale. At the conclusion of the hearing, the Court entered an order (the "Sale Order") that recit-

ed key parts of paragraph 7 of the Borrowing Order quoted above. The Sale Order contained the following pertinent findings:

As of April 17, 1991 [sic], Fleet's allowed claim against the Debtor's estate was in the amount of $3,375,695.19, and Jeld–Wen's allowed claim as of April 21, 1992, was in the amount of $1,234,632.38. Such indebtedness to Fleet is secured by a duly perfected and validly enforceable first lien security interest in and to the Assets and is not subject to any defenses, offsets or counterclaims, or avoidance under bankruptcy or applicable non-bankruptcy law, and is subject to the terms of that certain Intercreditor Agreement between Fleet and Jeld–Wen dated February 28, 1991.

The book value of the Assets was, as of April 25, 1992, $3,877,025.00. The estimated liquidation value of the Assets as of that date was estimated to be $1,821,035.00. Accordingly, if the Debtor's assets were liquidated, the Debtor's unsecured creditors would receive no dividend.

The Debtor has disclosed that the shareholders of the Purchaser under the Asset Purchase Agreement are also shareholders of the Debtor.

The Debtor presented good and sufficient business reasons for the sale of the Assets in the Motion and at the hearing on the sale.

The Asset Purchase Agreement provides, among other things, that the Purchaser will execute a promissory note in favor of the Debtor (the "Note"), to be assigned to the Committee, pursuant to which the Purchaser will agree to pay up to $125,000, plus accrued interest at the rate of 6.5% per annum, to the Committee for distribution, by the Committee to the Debtor's unsecured creditors. As the Debtor's unsecured creditors will receive a dividend if the sale of the Assets

2. On April 30, 1992, in conjunction with the Joint Motion to Sell, the Debtor filed a "Motion to Shorten Time for Filing Objections and of Hearing Date, to Limit Notice Thereof and for Entry of Procedural Order and Notice of Intended Sale." The Court denied the Debtor's motion to shorten time for notice of the hearing to 10 days and to limit notice of the proposed sale to the United States Trustee, the Creditors' Committee, Fleet, Jeld–Wen, Inc. and other creditors and equity security holders who held a leasehold or security interest in the Debtor's assets or who had filed notices of appearance.

to the Purchaser is approved, and they would receive no dividend if the Debtor's assets were liquidated, the Debtor's unsecured creditors will receive a greater dividend if the sale is approved than they will if the Debtor's assets were liquidated.

Based on the Purchaser's financial projections, there is a reasonable likelihood that the Purchaser will have sufficient assets and income to pay the Note in full on the terms provided therein.

The Debtor does not have sufficient funds to pay the additional administrative expenses associated with the plan confirmation process, and no one is willing to advance such sums to the Debtor for such purpose.

The price being paid by the purchaser for the Assets is fair and reasonable because the Purchaser is not only assuming all of the Debtor's secured indebtedness to Fleet and Jeld–Wen, but has agreed to pay up to $125,000, plus interest, to the Debtor's unsecured creditors and professional fees as allowed by the Court up to a maximum of $110,000....

The Sale Order also contained the following provisions:

> The Debtor is hereby authorized to transfer to the Purchaser all causes of action and claims of the Debtor's estate pursuant to, among other things, Bankruptcy Code sections 543, 547, 548, 549, 550, and 551 pursuant to the Asset Purchase Agreement. Pursuant to its financing arrangements with the Purchaser, and subject to an Intercreditor Agreement dated April 14, 1992 between Fleet and Jeld–Wen, *Fleet shall hold a lien and security interest in and to such causes of action and claims.* The Debtor shall convert its case to one under Chapter 7 within thirty days after the date hereof. To the extent that an Order of this Court is necessary to perfect such lien and security interest, this Court hereby orders that such lien and security interest shall be a duly perfected first priority, lien and security interest in favor of Fleet. Entry of this Order shall be sufficient and exclusive evidence of the validity, enforceability and perfection of such liens and priorities whether or not Fleet elects to file or record financing or other documents, or to take such other steps, as may otherwise be required to obtain evidence or perfect such liens or interests under applicable law.

> *The Purchaser, with the consent of Fleet, and Fleet, in its own right, are hereby authorized, even if this Court enters an order converting the Debtor's case to one under Chapter 7, to (a) commence and prosecute actions in this court in the name of the Purchaser, Fleet, the Debtor or any subsequently appointed Trustee with respect to the Debtor, pursuant to, among other things, Bankruptcy Code sections 543, 547, 548, 549, 550 and 551, and (b) settle such claims as Fleet, in Fleet's sole discretion, deems appropriate, for the sole benefit of the Purchaser and Fleet, without further approval of this Court.* Any actions under Code sections 543, 547, 548, 549, 550 and 551 shall be commenced within sixty (60) days after that date hereof. In the event that Fleet gives the Purchaser written notice of Fleet's intention not to pursue any one or more of such actions or claims (the "Released Actions"), the Purchaser shall thereafter be entitled to pursue such Released Actions. *Fleet shall have no obligation to any Chapter 7 or Chapter 11 Trustee appointed with respect to the Debtor regarding commencement, prosecution or settlement of actions authorized pursuant to this paragraph. This Court shall retain jurisdiction to enable the Purchaser and/or Fleet to commence, prosecute and settle actions pursuant to this paragraph even if this Court enters an Order dismissing the Debtor's case.*

(emphasis supplied).

On July 24, 1992, Fleet commenced 20 adversary proceedings. The eight preference complaints now before the Court are summarized as follows:

| AP. No. | Defendant | Alleged Preference | Notice Borrowing and Sale |
|---------|-----------|--------------------|--------------------------|
| 92–1476 | Doorcrafters | $ 182,829 | Sale only |
| 92–1478 | Just Cabinets, Inc. | $ 55,117 | Borrowing and Sale [3] |
| 92–1479 | Marvin Lumber & Cedar Company | $2,009,856 | Borrowing and Sale |
| 92–1480 | ODL, Inc. | $ 52,880 | Borrowing and Sale |
| 92–1481 | Setzer Forest Products | $ 43,678 | None |
| 92–1482 | Stanley Door Systems | $ 365,628 | None |
| 92–1484 | Visador Company | $ 84,662 | Borrowing and Sale |
| 92–1485 | Woodfold–Macro Manufacturing Co. | $ 35,713 | None |

Approximately one month after the commencement of the adversary proceedings, the Debtor moved to convert its Chapter 11 case to a case under Chapter 7. The motion was allowed on September 1, 1992.

## III. MOTIONS TO DISMISS

### A. Plaintiffs' Position

Marvin Lumber & Cedar Co. ("Marvin"), as the defendant with the largest sum of money at stake, filed a Motion to Dismiss and a comprehensive and representative memorandum that a number of other defendants have incorporated by reference in their memoranda. Accordingly, the Court shall summarize Marvin's arguments and refer to the arguments of other defendants only if they have not been raised by Marvin.

Marvin begins its argument by making two points: 1) that the Procedural Order and Notice of Intended Sale contained no statement that an adjudication would take place relating to unasserted preference claims or their transfer; and 2) that it did not in any way warn creditors that the perfection of Fleet's security interest in preference actions and the prosecution of those actions by Fleet were being placed at

issue on May 28, 1992. With these observations as a backdrop, Marvin argues that no one other than a debtor-in-possession or a trustee can prosecute preference actions. Marvin cites *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357 (Bankr. S.D.Tex.1986), for the proposition that:

> [N]either a trustee in bankruptcy nor a debtor-in-possession can assign, sell, or otherwise transfer, the right to maintain a suit to avoid a preference. If a trustee or a debtor-in-possession makes such an assignment, the assignment is of no effect.

*Id.* at 358. *See also United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930 (Bankr.E.D.N.Y. 1981).

In the *Texas General Petroleum* case, an assignee of mineral leases filed an action to avoid judicial liens on those leases as voidable preferences. The bankruptcy court determined that the assignee had no standing to void the preferences because it was neither a debtor, trustee, nor a representative of the creditors' committee, notwithstanding the debtor's assignment of causes of action with respect to the leases as part of an agreed order. The court

---

**3.** Just Cabinets, Inc. denies that it received notice of either the Debtor's borrowing or sale motions. However, this Court's review of the certificates of service filed in conjunction with the borrowing and sale indicates that Just Cabinets, Inc. appears on the service list.

found that the assignee was merely a creditor of the debtor attempting to exercise the avoidance power for itself and not for the benefit of the debtor's bankruptcy estate or the creditors as a whole. 58 B.R. at 358.

Secondly, Marvin argues that the avoidance powers of trustee (or debtors-in-possession as a result of 11 U.S.C. § 1107) are statutory powers conferred by Congress to effectuate the equitable distribution of assets, not property of the estate subject to sale. *See Foster Dev. Corp. v. Morning Treat Coffee Co., Inc. (In re Morning Treat Coffee Co., Inc.),* 77 B.R. 62 (Bankr. M.D.La.1987) (the term "claim" as used in section 1123(b)(3)(B) arguably does not include the trustee's avoidance power, since claim refers to a right to payment and an avoidance power is not a right to payment). Accordingly, Marvin argues that sale of the power to avoid preferences is against public policy.

Thirdly, Marvin argues that Fleet lacks standing to bring preference actions, since in its view, only those designated in section 547(b) acting in an official capacity and for the benefit of all unsecured creditors can bring preference actions. *See Drinker, Biddle & Reath v. Bacher (In re Bacher),* 47 B.R. 825 (Bankr.E.D.Pa.1985).

In its fourth argument, which is simply an extension and repetition of its previous arguments, Marvin cites *Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Products Corp.),* 69 B.R. 901 (D.N.J.1987), where the court considered whether a secured creditor had rights in preference recoveries as a result of a prepetition security interest in general intangibles. Marvin asserts that Fleet's security interest in preference actions is null and void because only the trustee has power to recover preferences and allowing preference actions to benefit a single creditor violates public policy. Marvin adds that Fleet cannot rely upon the Borrowing Order of March 27, 1991 for two reasons: 1) because the purported transfer of the security interest was improper, *In re Sapolin Paints, Inc., supra,* at 937; and 2) because the original security interest must be limited under section 506(a) to the value of the collateral at the time of the filing. In other words, in Marvin's view, since Fleet's claim was undersecured, the Borrowing Order could not collateralize Fleet's unsecured claim or increase the amount of its secured claim except to the level of advances made by Fleet after the Borrowing Order was entered. In this regard, Marvin also argues that even a valid security interest in preference actions cannot confer standing under the plain language of section 547(b).

Marvin also argues that the Court lacks jurisdiction because Fleet's complaint cannot affect the estate in any way. *In re G.S.F. Corp.,* 938 F.2d 1467 (1st Cir.1991); *In re Xonics, Inc.,* 813 F.2d 127 (7th Cir. 1987); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984). Finally, Marvin asks the Court to vacate the May 28, 1992 Sale Order to the extent that it transferred preference actions to Fleet or recognized any security interest in preference actions.

### B. Fleet's Response

Fleet argues that in the context of this case the assignment of the right to prosecute preference claims is permissible. Noting that someone other than a debtor or trustee may exercise the authority to avoid preferences pursuant to a plan of reorganization, *see* 11 U.S.C. § 1123(b)(3); *In re Kroh Bros. Dev. Co.,* 101 B.R. 1000, 1005 (W.D.Mo.1989); *In re Xonics, Inc.,* 63 B.R. 785, 788 (Bankr.N.D.Ill.1986), it maintains that the same test for evaluating an assignment in the context of a Chapter 11 plan of reorganization should apply in the instant case. That test is whether the bankruptcy estate derives or derived some benefit. *See, e.g., In re Sweetwater,* 884 F.2d 1323, 1326–27 (10th Cir.1989); *In re Churchfield Management & Investment Corp.,* 122 B.R. 76, 82 (Bankr.N.D.Ill.1990). Fleet cites two other Chapter 11 cases in support of its position, one involving a sale, *In re Professional Investment Properties of America,* 955 F.2d 623, 625–26 (9th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992), and the other involving security for the extension of a postpetition line of credit. *Tennessee Wheel & Rubber Co. v. Captron Corp. Air Fleet (In re Tennessee Wheel & Rubber Co.),* 64 B.R. 721 (Bankr.M.D.Tenn.1986), *aff'd,* 75 B.R. 1 (M.D.Tenn.1987).

In *In re Professional Investment Properties, supra,* the Court of Appeals for the Ninth Circuit considered the issue of whether the contents of an involuntary petition put the trustee on sufficient inquiry notice of an unrecorded instrument to prevent the trustee from invoking his avoidance powers. Resolution of the issue required a determination of whether the trustee's strong arm powers were transferable to the purchaser of the estate's claim to the proceeds from the sale of the real property on which an equitable lien was claimed as a result of the unrecorded instrument. Referring to *In re Sweetwater, supra,* the Ninth Circuit court stated that it agreed with the Tenth Circuit's analysis and determination that *Grass v. Osborn,* 39 F.2d 461 (9th Cir.1930) (a case in which the court held that the trustee's avoidance powers could not be transferred), had been superseded by 11 U.S.C. § 1123(b)(3). The *Professional Investment Properties* court stated the following:

> If a creditor is pursuing interests common to all creditors or is appointed for the purpose of enforcement of the plan, he may exercise the trustee's avoidance powers.
>
> Here, the trustee sold the estate's claim to the proceeds from the sale of the property with the tacit approval of the bankruptcy court. The court ordered the estate's interest in the appeal terminated and that all responsibility for the claim rested with [the purchaser]. While [the purchaser] may be acting on his own, he does so with the apparent blessing of the bankruptcy court and the trustee. Clearly, it was in the estate's interests to resolve its involvement in the dispute. In fact, while it was not argued by [the purchaser], nor was he specifically identified for this purpose, he could best be identified as a representative appointed to enforce the debt in line with section 1123(b)(3)(B).
>
> More importantly, the trustee originally asserted the avoidance powers in the bankruptcy and district courts. To refuse [the purchaser] the opportunity to stand in the trustee's shoes would frustrate the obvious wish of the bankruptcy

court to end its participation in the matter. In *Texas General Petroleum,* there was no such involvement by the trustee or the bankruptcy court. The creditor was acting independently and for his sole benefit. For these reasons, we hold that [the purchaser] may assert the powers of the trustee.

955 F.2d at 626.

Fleet asserts that there was a substantial benefit to the estate from the sale. It points out that had the Debtor's assets been liquidated there would have been no distribution to unsecured creditors, instead of the $125,000 distribution provided for through the sale, the consideration for which it maintains was the right to prosecute preference actions. Moreover, Fleet claims that the sale allowed existing trade creditors to retain a retail customer for their products.

Fleet next argues that Marvin is precluded from seeking to modify or otherwise disturb the finality of the Borrowing Order or the Sale Order. Fleet relies upon 11 U.S.C. §§ 364(e) and 363(m), respectively, as well as the fact that no appeals or motions for reconsideration were filed and, at least in its view, the balance of the equities favors leaving the orders undisturbed.

Section 364 of the Bankruptcy Code provides:

> (e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt or the granting of such priority lien, were stayed pending appeal.

11 U.S.C. § 364(e). The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whit-*

*ing,* 908 F.2d 1351, 1377 (7th Cir.1990); *Matter of Chicago, Milwaukee, St. Paul & Pacific,* 799 F.2d 317, 330 (7th Cir.1986), *cert. denied,* 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987). Fleet notes that the Borrowing Order contains a finding that it acted in good faith. Accordingly, Fleet argues that its reliance upon the lien in preference actions and its expectations should not be frustrated at this point in time.

With respect to the Sale Order, section 363(m) provides:

> (m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). In view of this provision, Fleet maintains that since the Sale Order contained a finding that Fleet acted in good faith and no appeal was filed to the Sale Order, this Court is barred from otherwise modifying or disturbing it. Moreover, Fleet argues that the Court should not treat the motions to dismiss as motions for reconsideration of either the Borrowing Order or the Sale Order since, under the circumstances, motions for reconsideration would be untimely. *See* Fed.R.Bank.P. 60(b). With respect to the modification of sale and borrowing orders, the Court of Appeals for the Seventh Circuit stated in *Kham & Nate's Shoes, supra,* the following principal that would apply equally to both sections 363(m) and 364(e):

> ... a lender that extends credit in reliance on a financing order is entitled to the benefit of that order, even if it turns out to be legally or factually erroneous. Although § 364(e) speaks only of modification on appeal, it instantiates the principle that bankruptcy judges may make *binding* commitments to give priority to new credit. If creditors fear that the rug will be pulled out from under them, they will hesitate to lend. So § 364(e) and companion provisions, e.g., 11 U.S.C.

§ 363(m), former Bankruptcy R. 8–703(a)(6), disable courts from backtracking on promises in the absence of bad faith, which is a very narrow exception.

908 F.2d at 1355 (citations omitted, emphasis in original).

Fleet argues that equitable considerations favor its position in view of its reliance on the Borrowing and Sale Orders and the windfall that Marvin would reap if it could keep the $2 million in payments it received during the preferences period. Finally, Fleet argues that this Court has jurisdiction because of the retention of jurisdiction in the Sale Order. Fleet relies upon *In re Churchfield Management, supra,* and distinguishes *In re Xonics, Inc.,* 813 F.2d 127 (7th Cir.1987). In the latter case, the court illustrated the scope of jurisdiction with the following example:

> Suppose A, B, and C claim interests in a pool of oil. If A is a bankrupt, the bankruptcy court could determine the interest of all three in the property under 28 U.S.C. § 157(b)(2) or § 157(c)(1), because only after identifying the "property" or the estate may the court apportion that property among creditors. But if the estate should disclaim any interest in the pool, only the dispute between B and C would remain. The resolution of that dispute would not affect the creditors of the bankrupt, and there would be no source of jurisdiction. That B and C might also be creditors of the bankrupt would not enlarge the court's power; there is no jurisdiction to resolve all disputes among creditors of a bankrupt. There is jurisdiction under § 157(c)(1) only when the dispute is "related to" the bankruptcy—meaning that it affects the amount of property available for distribution or the allocation of property among creditors. *In re Paso del Norte Oil Co.,* 755 F.2d 421 (5th Cir.1985); *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994–96 (3d Cir.1984).

813 F.2d at 131. *But see In re Lafayette Radio Electronics Corp.,* 761 F.2d 84 (2d Cir.1985), and *In re Salem Mortgage Co.,* 783 F.2d 626 (6th Cir.1986).

## IV. DISCUSSION

The issue presented in this case is not whether the Borrowing Order and Sale

Order can be modified, because under the reasoning of *Kham & Nate's Shoes, supra,* they cannot and should not be modified, although, obviously, both orders can be interpreted. Rather the issues are whether, in light of section 547(b) and the growing body of case law under 11 U.S.C. § 1123(b)(3)(B), Fleet has standing to pursue preference claims, and if not, whether the defendants are entitled to the dismissal of the preference complaints despite the provision of the Sale Order authorizing Fleet to commence and prosecute preference claims.

■ In the first place, the statutory scheme is clear. Absent section 1123(b)(3)(B), section 547 of the Bankruptcy Code only gives trustees and debtors-in-possession, as a result of 11 U.S.C. § 1107, the power to avoid preferential transfers, although most courts have found an implied but qualified right for creditors' committees to initiate adversary proceedings despite the absence of express authority in the Bankruptcy Code. *See In re STN Enterprises, Inc.,* 779 F.2d 901, 904 (2d Cir. 1985). Therefore, absent the appointment of another entity to bring preference actions in a plan of reorganization, there is no statutory authority for Fleet to bring the preference claims now before the Court. Moreover, only a single court has permitted the assignment of a trustee's avoiding powers outside a Chapter 11 plan. *In re Professional Investment Properties, supra.* That case is distinguishable from the instant case for reasons discussed below.

Section 1123(b)(3) provides in relevant part:

(b) Subject to section (a) of this section, a plan may—...

(3) provide for—...

(A) The settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) The *retention and enforcement by* the debtor, by the trustee or *a representative of the estate appointed for such purpose,* of any such claim or interest....

11 U.S.C. § 1123(b)(3) (emphasis supplied). In *In re Churchfield Management & Investment Corp., supra,* the court recognized that under section 1123(b)(3)(B), "a party who is neither the debtor nor the trustee but who seeks to enforce a claim must establish two elements: (1) that it has been appointed; and, (2) that it is a representative of the estate." 122 B.R. at 81, *citing Temex v. Hastie and Kirschner (In re Amarex, Inc.),* 96 B.R. 330, 334 (W.D.Okla.1989). *See also In re Kroh Bros. Dev. Co.,* 100 B.R. 487, 497 (Bankr. W.D.Mo.1989).

Courts are in agreement that provisions in confirmed plans conferring on a particular party the right to bring a particular action are sufficient to constitute the "appointment" required by section 1123. *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1180 n. 1 (11th Cir.1987); *In re Kroh Bros. Dev. Co.,* 100 B.R. at 497; *In re Amarex,* 96 B.R. at 334; *Southern Commodity Corp. Official Liquidating Comm. v. El Campo Rice Milling Co., Inc. (In re Southern Commodity Corp.),* 78 B.R. 626, 627 (Bankr.S.D.Fla. 1987); *Perlstein v. Saltzstein (In re AOV Industries, Inc.),* 62 B.R. 968, 970 n. 1 (Bankr.D.C.1986).

With respect to the second part of the test, courts use a case-by-case approach to determine whether the party is a "representative of the estate," focusing on whether the appointed representative's recovery would benefit the estate. *In re Sweetwater,* 884 F.2d at 1326; *In re Kroh Bros. Dev. Co.,* 100 B.R. at 497; *In re Amarex, Inc.,* 96 B.R. at 334; *In re Tennessee Wheel & Rubber Co.,* 64 B.R. at 725. For example, in *Kroh Brothers* the court, while recognizing "the long line of cases either holding that the avoiding powers cannot be transferred to a single creditor or group of creditors for their sole benefit or in which a single creditor was denied the right to pursue preference or fraudulent conveyance actions," [4] focused on the "substantial ben-

---

4. The court in *Kroh Bros. Dev. Co.,* cited, among others, the following cases: *Nebraska State Bank v. Jones,* 846 F.2d 477 (8th Cir.1988); *Saline State Bank v. Mahloch,* 834 F.2d 690 (8th

Cir.1987); *In re Delgado Oil Co. v. Torres,* 785 F.2d 857 (10th Cir.1986); *Hansen v. Finn (In re Curry & Sorensen, Inc.),* 57 B.R. 824 (9th Cir. BAP 1986); *In re V. Savino Oil & Heating Co.,*

efit" to the estate from the plan provisions that ultimately permitted a representative to commence preference complaints. The court also gave "great deference to ... [the] ... overwhelming vote in favor of the Plan by the Class 6 unsecured creditors." 100 B.R. at 498; *see also Tennessee Wheel & Rubber Co.*, 64 B.R. at 724.

■ Courts have found benefit to the estate in a variety of forms, including indirect benefits such as the increase in assets resulting from recoveries by the representative of the debtor's successor-in-interest that would increase the value of ownership rights in the successor-in-interest held by the unsecured creditors, *see Duvoisin v. East Tennessee Equity, Ltd. (In re Southern Industrial Banking Corp.)*, 59 B.R. 638 (Bankr.E.D.Tenn.1986), or an increase in the probability of a successful reorganization. *In re Tennessee Wheel & Rubber Co.*, 64 B.R. at 725–26. *See also In re Amarex, Inc.*, 96 B.R. at 334. Indeed, in *In re Churchfield Management & Investment Corp.*, the court stated:

> [T]here is nothing in the Bankruptcy Code or precedent which indicates that "benefit" to the estate and its creditors cannot occur prior to the actual recovery on a claim for § 1123(b)(3)(B) purposes. In addition, should W & S [the representative] be unable to use the authorities assigned to it, W & S might have a claim for partial failure of consideration and might assert a right to recover some of the settlement proceeds paid by it.

122 B.R. at 82. Thus, the focus is on whether the assignment is for the sole benefit of a stranger to the estate as an assignee or is for the benefit of parties in interest, especially unsecured creditors. Unequivocal assignments must be distinguished from transfers to representatives of the estate. *In re Crowthers McCall*

*Pattern, Inc.*, 120 B.R. 279, 285 (Bankr. S.D.N.Y.1990).

Not all courts have found assignments to be beneficial to unsecured creditors. In the Chapter 11 case of *Consolidated Pet Foods, Inc. v. Millard Refrigerated Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34 (Bankr.D.Colo.1990), involving a bankruptcy court approved sale of all the debtor's assets, including all avoidance actions pursuant to 11 U.S.C. §§ 544–549, the bankruptcy court considered motions to dismiss preference complaints brought by the debtor and the purchaser of the preference claims. The court summarily dismissed the purchaser as a proper plaintiff, citing *In re Sweetwater, supra,* and *Delgado Oil Co., Inc. v. Torres*, 785 F.2d 857 (10th Cir.1986). 110 B.R. at 36. With respect to the Debtor's ability to assert the avoidance powers on the theory that the assignment was ineffective and that the debtor retained the right to bring the avoidance actions but sold and assigned the rights to the proceeds of those actions to the purchaser, the court ruled that "[w]here a third party has acquired assets of the estate, even a trustee or debtor in possession is precluded from asserting avoidance actions which benefit only that third party." 110 B.R. at 36, *citing In re Texas General Petroleum Corp., supra.* The court also addressed the purchaser's argument that without the preference actions the entire asset purchase agreement would "come tumbling down" and deprive the estate and its creditors of the benefit of the sale. The court stated:

> If [the purchaser] wants to bring an action to rescind the Purchase Agreement or for breach thereof, that is its prerogative. Although by way of *dicta,* this Court sees little, if any, chance of success in such an endeavor if it is based

*Inc.*, 91 B.R. 655 (Bankr.E.D.N.Y.1988); *Gerken v. Harris (In re Auxano, Inc.)*, 87 B.R. 72 (Bankr. W.D.Mo.1988); *Foster Development Corp. v. Morning Treat Coffee Co. (In re Morning Treat Coffee Co.)*, 77 B.R. 62 (Bankr.M.D.La.1987); *Mellon Bank (East), N.A. v. Glick (In re Integrated Testing Products Corporation)*, 69 B.R. 901 (D.N.J.1987); *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.)*, 58 B.R. 357 (Bankr.S.D.Tex.1986); *Drinker, Biddle & Reath v. Bacher (In re Bacher)*, 47 B.R. 825 (Bankr.E.D.Pa.1985); *Skinner v. Teal (In re Teal)*, 35 B.R. 360 (Bankr.E.D.Pa.1984); *Exchange National Bank of Chicago v. Van Brock (In re Van Brock)*, 33 B.R. 546 (Bankr.S.D.Fla. 1983); *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.)*, 11 B.R. 930 (Bankr.E.D.N.Y.1981). 100 B.R. at 499–500 n. 16.

solely on [the purchaser] and the Debtor being unable to pursue these avoidance actions. The Court is unaware of any warranties given by the Debtor in conjunction with these avoidance actions and a mistake of law does not relieve a party from his contract. Besides, [the purchaser] was represented by competent counsel throughout—counsel who is extremely well versed in bankruptcy law.

110 B.R. at 37. Thus, the Colorado bankruptcy court dismissed the preference complaints, refusing to allow either the purchaser or the debtor to maintain them.

■ Like the situation in *S & D Foods, Inc.*, section 1123(b)(3)(B) simply does not apply in the absence of a Chapter 11 plan of reorganization. Here, a Chapter 11 plan of reorganization was never submitted to the vote of all creditors, and it can hardly be said that failure to object to a sale is the same as an overwhelming endorsement of a plan of reorganization. Nevertheless, Fleet is essentially asking the Court to consider the Joint Motion to Sell and the Notice of Intended Sale to be the functional equivalent of an adequate disclosure statement and a reorganization plan appointing it a representative of the estate.

When the Joint Motion to Sell and Procedural Order and Notice of Intended Sale are scrutinized it is clear that they fall far short ˈof and are not a substitute for a disclosure statement and plan of reorganization. The failure on the part of the Debtor, Creditors' Committee, and Fleet to disclose the extent and gross value of preference claims (over $3 million) in the Joint Motion to Sell and, particularly, at the May 28, 1991 hearing, is precisely why sales of all assets are disfavored, at least by this Court, in the absence of full disclosure, a plan, and the vote of all creditors entitled to vote on a plan. *See In re Braniff Airways, Inc.*, 700 F.2d 935 (5th Cir.1983). Indeed, had the proponents of the sale disclosed the full extent of the preference claims, this Court suspects that the outcome of the May 28, 1992 hearing would have been different. The failure to divulge the extent of the preference claims makes a mockery of the argument that the section 1123(b)(3)(B) test should apply to the instant case.

■ However, application of the section 1123(b)(3)(B) test to the sale is also unavailing. Assuming the Sale Order itself can serve the function of an appointment and thereby satisfy the first part of the test outlined above, Fleet's purported role as a "representative of the estate" presents an insurmountable hurdle.

In *In re Sweetwater, supra*, the court summarized the principle that provides the rationale for pre-section 1123(b)(3)(B) cases that prohibit the assignment of preferences, as well as cases where section 1123(b)(3)(B) applies:

> [P]ost-petition avoidance actions should be pursued in a manner that will satisfy the basic bankruptcy purpose of treating all similarly situated creditors alike; one or more similarly situated creditors should not be able to pursue an avoidance action for their exclusive benefit.

884 F.2d at 1328. Applying this principle to this case, it is important to keep in mind that Acquisition Corp., not Fleet, purchased "all potential claims and causes of action arising under sections 543, 547, 548, 549, 550 and 551 of the Bankruptcy Code." Acquisition Corp. also assumed the Debtor's obligations to Fleet evidenced by new loan documents whose principal amounts totalled $3,550,000. Moreover, Acquisition Corp., not Fleet, executed the note to the Debtor in the amount of $125,000 that was assigned to the Creditors' Committee for distribution to unsecured creditors. Payments under the note are capped at $125,000, no payments are due under the note until 1994, and the note is neither guaranteed nor secured. Since the first payment is not due until the end of the 1994 fiscal year, the unsecured creditors have yet to receive any benefit from the sale of the Debtor's assets. However, counsel to the Debtor and counsel to the Creditors' Committee were to be paid most of their professional fees up to a maximum of $110,000.

Since Acquisition Corp. assumed the Debtor's obligations to Fleet, evidenced by new loan documents, it is unclear whether Fleet is even a creditor of the estate at this

point in time. Assuming that Fleet is a creditor, it is also unclear whether preference recoveries would inure to its benefit as a secured or unsecured creditor. Assuming the former scenario, a reduction in the amount of its secured indebtedness would reduce the amount of secured debt owed by Acquisition Corp., thereby benefitting the shareholders of Acquisition Corp., unless Fleet is in the enviable position of being entitled to be paid twice on its loans to the Debtor. Alternatively, if Fleet holds a deficiency claim or a claim unsupported by the value of the Debtor's assets at the commencement of the case plus the amount of any unreimbursed advances to the Debtor during the pendency of the Chapter 11 case—an unsecured claim—then any payments on that claim stemming from preference recoveries would result in its receiving more favorable treatment and a much greater benefit than the other unsecured creditors.[5] Accordingly, under any scenario the principle enunciated by the circuit court in *Sweetwater* would be violated.

Moreover, had Acquisition Corp., Fleet, Jeld–Wen and the Creditors' Committee attempted to effectuate the identical treatment of creditors that result from the Sale Order through a plan, the plan could not be confirmed for numerous reasons, including improper classification of claims, unfair discrimination between classes of claims and violation of the absolute priority rule. Under these circumstances, the present case is distinguishable from the cases relied upon by Fleet, as there was 1) no plan of reorganization to implicate the provisions of section 1123(b)(3)(B); 2) no overwhelming vote of unsecured creditors in favor of a plan; and 3) even applying for the sake of argument the two-part test regarding section 1123(b)(3)(B), no benefit, let alone a *substantial* benefit, to unsecured creditors from the sale, at least at this point in time.

The only case similar to the instant one, other than *S & D Foods, Inc., supra, In re Professional Investment Properties, su-*

pra, is distinguishable in several important respects. In *Professional Investment Properties*, unlike the instant case, the trustee asserted his avoidance powers prior to the sale, the trustee transferred his rights as a lien creditor pursuant to 11 U.S.C. § 544, which rights arise as of the commencement of the case and affect the quality of title obtained by the buyer of property, and the circuit court's decision implied that the bankruptcy court's involvement in the matter would be terminated as a result of the trustee's sale. Since the Debtor did not assert preference claims prior to the sale, the *Professional Properties* case does not dictate a result in favor of Fleet.

■ With these precepts in mind, it follows that the Sale Order explicitly approved what upon due consideration were inappropriate assignments of the right to bring preference claims first to Acquisition Corp. and then to Fleet. Since neither the statutory scheme nor the rationale of the line of cases under section 1123(b)(3)(B) permitting appointed representatives of the estate to bring preference claims pursuant to plans of reorganization applies, the motions to dismiss are meritorious with respect to Fleet's lack of standing to prosecute preference claims. Although this Court's Sale Order expressly authorized Fleet to commence and prosecute preference claims, the Sale Order did not address, let alone purport to bar, the rights of preference defendants to contest Fleet's standing. Moreover, the Sale Order did not contain a guarantee that Fleet's prosecution of preference claims would be successful or that its security interest in the preference recoveries would have value. *See In re S & D Foods, Inc.*, 110 B.R. at 37. As the court in *In re Xonics, Inc.*, 63 B.R. 785 (Bankr.N.D.Ill.1986), stated with respect to a confirmation order:

These defendants are not estopped by the mechanics of the confirmation proce-

---

5. In the Borrowing Order, Fleet's secured claim was acknowledged to be $4,115,124.52. In the Sale Order, Fleet was acknowledged to be owed as of April 17, 1992. $3,375,695.19, a reduction of approximately $739,000. The court assumes

that the April 17, 1991 date in the Sale Order was a typographical error because immediately thereafter Jeld–Wen, Inc.'s claim is set forth as of April 21, 1992.

dures from urging when sued that the court may not do what the code or case law specifically prohibits. A creditor's vote in favor of confirmation is not an agreement to permit an impermissible adversary proceeding to be filed against the creditor. That creditor does not waive any defenses based on the powers and authorities of this court.

*Id.* at 787. The same rationale applies even more forcefully to the Sale Order. Thus, this Court holds that *In re Texas General Petroleum Corp., supra,* and its progeny remain sound law in the context of this case.

■ The only other issue that must be addressed is what if any effect sections 364(e) and 363(m) have on the motions to dismiss. If this Court is precluded from modifying the Sale Order to which no appeal was taken, and Fleet is authorized to commence and prosecute these adversary proceedings, are the defendants precluded from defending the preference actions as a result of either of these two sections? Clearly, the answer is no. The purpose of section 363(m) is to protect purchasers. This Court's review of the sale documents reveals that Fleet was not a purchaser of the Debtor's assets—Acquisition Corp. was the purchaser. Therefore, section 363(m) does not apply to Fleet. Thus, section 363(m) does not protect Fleet, does not preclude the defendants from challenging the assignment of the section 547 claims, and does not prohibit this Court from allowing the motions to dismiss. *Cf. In re Xonics, Inc.,* 63 B.R. at 787.

■ With respect to section 364(e), Fleet's security interest in the preference claims remains. However, holding a security interest in preference recoveries and successfully overcoming motions to dismiss the preference actions where the Bankruptcy Code limits the persons with standing to bring section 547 complaints are not identical. Accordingly, Fleet's security interest does not in and of itself enable Fleet to withstand motions to dismiss the preference complaints. Moreover, under the reasoning of *In re S & D Foods, Inc., supra,*

joinder of the Debtor as a party plaintiff would be unavailing.

In view of the Court's decision with respect to standing, the Court need not address the arguments raised by the defendants that the Court lacks jurisdiction over these disputes between non-debtors and the lack of notice of the contents of the Sale Order. Likewise, the Court need not consider the motions to vacate or reconsider part or all of the Sale Order.

## V. CONCLUSION

In accordance with the foregoing, the Court hereby allows the defendants' motions to dismiss. Appropriate orders shall issue.