In re **FURRS**, Debtor.

Yvette J. Gonzales, Plaintiff,

v.

**Nabisco Division of Kraft Foods, Inc., Defendant.**

Yvette J. Gonzales, Plaintiff,

v.

**ConAgra Foods, Inc., Defendant.**

Yvette Gonzales, Trustee, Plaintiff,

v.

**SC Johnson & Johnson, Inc., Defendant.**

Yvette Gonzales, Plaintiff,

v.

**Wisconsin's Finest, Inc., Defendant.**

Yvette Gonzales, Trustee, Plaintiff,

v.

**Mead Johnson & Co., Defendant.**

Yvette Gonzales, Plaintiff,

v.

**DPI Food Products Company, Defendant.**

Bankruptcy No. 7–01–10779 SA.

Adversary Nos. 02–1091 S, 02–1095 S, 02–1111 S, 02–1117 S, 02–1121 S, 02–1128 S.

United States Bankruptcy Court, D. New Mexico.

June 12, 2003.

David T. Thuma, Chris W. Pierce, Victor E. Carlin, Albuquerque, NM, Valerie L. Bailey–Rihn, Madison, WI, Robert J. Bothe, Michael Eversden, Omaha, NE, Paul M. Fish, Robert A. Johnson, Michael Wile, Albuquerque, NM.

## MEMORANDUM OPINION IN SUPPORT OF ORDERS DENYING MOTIONS TO DISMISS FOR LACK OF STANDING

JAMES S. STARZYNSKI, Bankruptcy Judge.

The Defendants in these adversary proceedings have moved to dismiss the avoidance actions against them, in whole or in part, arguing that the Trustee lacks standing to pursue the claims. Having considered the oral and written arguments of the parties, the Court will deny the motions challenging the Trustee's standing to bring these actions. This is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

### Background:

On February 8, 2001, the Debtor filed its chapter 11 petition and continued operat-

ing as a debtor in possession in the retail supermarket business. On March 14, 2001, the Court entered a final Debtor in Possession financing order,[1] a portion of which granted the Lenders[2], whose prepetition claims were already secured by a lien on most of the estate's assets, a further security interest in and lien on substantially all the Debtor's assets, but not on the estate's avoidance claims and the proceeds therefrom.

Later, in recognition of the Debtor's dismal and diminishing prospects for continuing in business, the Court entered a sale order[3] on July 3, 2001, pursuant to which the Debtor sold the majority of its assets on August 31, 2001 and ceased retail operations. Finding itself without funds to effect a measured or organized winding up of the chapter 11 case and having anticipated that problem, the Debtor obtained approval for post-sale borrowings, pursuant to which the Debtor borrowed approximately $4.3 million from the Lenders.[4] These funds permitted the Debtor to perform several functions vital to the administration of the case and to people's lives, such as to pay the employees their final wages, issue W–2s, administer the 401(k) and pension plans, and prepare tax returns. The borrowing was secured by, among other things, a lien on the estate's avoidance actions. On December 19, 2001, the case converted to a chapter 7 case and Ms. Gonzales was appointed as the chapter 7 trustee. Upon conversion, the unpaid chapter 11 administrative expenses totaled about $7 million.

On July 26, 2002, the Court approved a settlement agreement[5] between the Trustee and the secured Lenders which resolved a series of disputes between the parties arising from the administration of the chapter 11 case and its aftermath, and provided for repayment of the post-sale preconversion borrowing. The settlement agreement reduced the amount to be repaid to $2.3 million plus interest. It also provided in relevant part that the Trustee would file the avoidance actions, and that the proceeds therefrom would be distributed first to paying the litigation costs, then 3% for the Trustee's commission, then split one-third to the estate and two-thirds to the Lenders until the $2.3 million is repaid, with any remainder to the estate. The

1. Final Order (1) Authorizing Debtor to Obtain Secured Financing, (2) Granting Adequate Protection and (3) Granting Other Relief (doc 241). The docket references throughout this opinion are to either the main case (11–01–10779) or to a specific adversary proceeding, all of which are identified in the caption. Since there is only one main case and since each defendant has its own adversary proceeding, the Court has assumed that the title of the document or the context in which it is cited obviates the need to identify the case or adversary proceeding in which the document has been filed.

2. Metropolitan Life Insurance Company, Fleet Capital Corporation, Bank of America, N.A. and Heller Financial, Inc.

3. Order (i) Approving Asset Purchase Agreement with Fleming Companies, Inc., (ii) Authorizing the Sale of All or Substantially All of the Debtor's Operating Assets and the Transactions Contemplated by the Asset Purchase Agreement, and (iii) Granting Related Relief (doc 710).

4. Final First Post–Closing Order Supplementing Final Order (1) Authorizing Debtor to Obtain Secured Financing; (2) Granting Adequate Protection and (3) Granting Other Relief, to Permit Short–Term Financing ad Use of Cash Collateral, entered September 26, 2001 (doc 1102).

5. Stipulation and Consent Order (I) Approving Compromise and Settlement Between the Trustee on behalf of the Estate, Heller Financial, Inc., Bank of America, N.A., Fleet Capital Corporation and Metropolitan Life Insurance Company and (II) Resolving All Objections Thereto (doc 1766).

Trustee has estimated [6] that there will be significant recoveries beyond what is needed to repay the $2.3 million to the Lenders. As a result of her estimate, the Trustee also asserts that the chapter 7 administrative expenses will be paid in full, the chapter 11 expenses will be paid in significant part, but there will be no distribution whatever on nonpriority unsecured claims and, *a fortiori,* nothing going back to the debtor.

The Trustee's estimates assume the one-third-two-thirds split of proceeds with the Lenders as the basis to repay the borrowing. Paragraph 7 of the settlement agreement also provides that the Lenders may assert in effect a chapter 11 § 507(b) super-priority status for whatever portion of the $2.3 million remains unpaid from the avoidance action proceedings. Thus, were it the case that the Lenders did not receive their two-thirds share of the net recoveries, the Trustee would be obligated to use whatever assets she retains after payment of the chapter 7 administrative expenses, including any net avoidance recoveries she receives, to repay the $2.3 million.

The settlement agreement also provides as follows in paragraph 6(a):

6. *E.g.,* Affidavit of Yvette J. Gonzales, paragraphs 9–10, attached to Chapter 7 Trustee's Response to [Wisconsin's Finest's] Motion for Summary Judgment and Cross–Motion for Summary Judgment on the § 550 Standing Issue (doc 26, 27). ConAgra disputes the strength of the Trustee's showing. Reply Brief in Support of [ConAgra's] Motion for Summary Judgment and in Opposition to Chapter 7 Trustee's Cross–Motion for Summary Judgment on the § 550 Standing Issue, at 7–8 (doc 40).

7. "The term 'standing' is ambiguous. It signifies both the 'injury in fact' that is the irreducible minimum of the case-or-controversy requirement of Article III and also a higher degree of relation to a matter in litigation that courts or Congress demand as a prudential matter before permitting a party to be heard. The same person may be 'injured

"Until the [Lenders' liens are] fully satisfied, any settlement of Avoidance Actions shall require the written consent of the Lenders and approval of the Bankruptcy Court, provided that if the Lenders do not consent to any proposed settlement, the Trustee may seek to obtain Court approval of the settlement in any event, based on whether the settlement is fair and reasonable under the circumstances without giving any deference to the business judgment of either the Trustee or the Lenders."

### Analysis:

 Defendants primarily challenge the Trustee's "standing" [7] on the ground that the agreement to pay part of the proceeds to the Lenders means that the recovery is not for the benefit of the estate as required by 11 U.S.C. § 550(a), and therefore the Trustee may not seek to recover the proceeds. Defendants raise other arguments as well, which the Court will also address.[8]

### Assignments of avoidance actions generally:

 DPI argues [9] that at least since 1909, courts have held preference actions

in fact' for purposes of the constitutional minimum and nevertheless lack standing for prudential reasons because it is possible to have one form of standing but not the other. This leads to the linguistic paradox that a person with standing may lack standing." *In re Godon, Inc.,* 275 B.R. 555, 563 (Bankr.E.D.Cal. 2002) (approving agreement between trustee and creditor bank for creditor bank to pursue avoidance actions for estate).

8. Contrary to the statement in the Chapter 7 Trustee's Response to ConAgra's Motion for Summary Judgment and Cross–Motion for Summary Judgment on the § 550 Standing Issue, at 12 (doc 33, 34), there were no "weak briefs" filed or argued in these actions.

9. DPI Food Products Company's Supplemental Brief, at 1–2 (doc 32).

to be non-assignable, citing *Belding–Hall Mfg. Co. v. Mercer & Ferdon Lumber Co.,* 175 F. 335 (6th Cir.1909). "[It] is the well-settled principle that neither a trustee in bankruptcy, nor a debtor-in-possession, can assign, sell, or otherwise transfer the right to maintain a suit to avoid a preference." *United Capital Corp. v. Sapolin Paints, Inc. (In re Sapolin Paints, Inc.),* 11 B.R. 930, 937 (Bankr.E.D.N.Y.1981) (Citations omitted.) In *Texas General Petroleum Corp. v. Evans (In re Texas General Petroleum Corp.),* 58 B.R. 357, 358 (Bankr. S.D.Tex.1986), where the debtor in possession had transferred to a secured creditor its rights to pending preference actions in response to a motion for stay relief, the court held that

> "neither a trustee in bankruptcy nor a debtor-in-possession can assign, sell, or otherwise transfer, the right to maintain a suit to avoid a preference. If a trustee or a debtor-in-possession makes such an assignment, the assignment is of no effect."

The standards for whether, or more accurately when, an assignment is possible are addressed by the Code in § 550(a) and, in the case of chapter 11 cases (which this case no longer is), §§ 1107(a) and 1123(b)(3)(B). However, it is clear that on the face of the settlement agreement and of these adversary proceedings, the Trustee has not absolutely assigned the avoidance actions to Lenders.

■ Section 550(a) provides in relevant part as follows:

> "Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the *trustee* may recover, *for the benefit of the estate,* the property transferred, or,

if the court so orders, the value of such property, ..." (Emphasis added.)

"Section 550 ... enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee."[10] Even if a transfer can be avoided, it is a separate step for a trustee to recover the proceeds, and she may only do so "for the benefit of the estate". 11 U.S.C. § 550(a).

■ The language of § 550(a) sets out the criteria for meeting the requirements of that section: it must be the trustee who retains the right to prosecute the recovery action, and the estate must benefit from the recovery. The Defendants have challenged these actions on both prongs of the standard.

*Trustee as plaintiff:*

■ There is nothing in the structure of the Code or the concept of recovering avoidances as such that would preclude some party other than a trustee from pursuing avoidances for an estate. However, the language of the statute, "... the trustee may recover ...", explicitly limits to the trustee the standing needed to recover avoidances for a chapter 7 estate. *E.g., Met–Al, Inc., v. Gabor (In re Metal Brokers Int'l, Inc.),* 225 B.R. 920, 921–22 (Bankr.E.D.Wis.1998) (creditor as assignee of claims in chapter 7 case lacks standing to prosecute avoidance claims); *Fleet Nat'l Bank v. Doorcrafters (In re North Atlantic Millwork Corp.),* 155 B.R. 271, 281 (Bankr.D.Mass.1993) (same); *compare Delgado Oil Co. Inc. v. Torres,* 785 F.2d 857, 860 (10th Cir.1986) (claim for corporate losses against director of a corporation now in bankruptcy may only be asserted by corporation's trustee); *contra, Briggs v. Kent (In re Prof'l Inv. Props. of*

---

**10.** H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), at 375, U.S.Code Cong. & Ad- min.News 1978, pp. 5963, 6331.

*America)*, 955 F.2d 623, 625–26 (9th Cir.), *cert. denied* 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992)(trustee's § 544 avoidance powers may be sold to and asserted by a creditor); *cf. Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 5–9, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (trustee is only entity with standing to seek § 506(c) surcharge). "Where rights or duties are statutory in origin, Congress has broad power to define the classes of persons who may be entitled to enforce them. Implicit in the congressional power to create rights and duties is the power to define the classes of persons who may enforce them. Wm. A. Fletcher, The Structure of Standing, 98 YALE L.J. 221, 223–24 (1988)." *In re Godon,* 275 B.R. at 564.

11. U.S.C. § 1123(b)(3)(B) allows "a representative of the estate", other than the trustee, to prosecute such claims if appointed to do so by a plan of reorganization[11], but because no plan was ever confirmed and this case is no longer a chapter 11 case, that provision is not and could not be applicable. 11 U.S.C. § 103; *North Atlantic Millwork,* 155 B.R. at 281, 283. Nor is this a case in which an unsecured creditors committee has been appointed in an unusual situation to pursue such claims. *E.g., Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.),* 330 F.3d 548, 553–54 (3rd Cir.2003); *Unsecured Creditors Committee of Debtor STN Enters., Inc. v. Noyes (In re STN Enters., Inc.),* 779 F.2d 901, 904 (2nd Cir.1985).

In this case, the settlement agreement is clear on its face that the trustee is the moving party in prosecuting and recovering the avoidances. Each avoidance action names the Trustee as plaintiff, and is being prosecuted by her.[12]

Notwithstanding the foregoing, DPI argues that the structure and the numbers of the settlement agreement "violates the principle of too much".[13] That is, as the Court understands the argument, the Trustee has committed to paying so much of the beneficial interest in the avoidance actions to the Lenders that, in effect, the Trustee is pursuing the avoidance claims as a representative of the Lenders. That, DPI and others argue, is the equivalent of having assigned the causes of action to the Lenders, citing *Metal Brokers Int'l, Inc.,* 225 B.R. 920. However, in that case the trustee had literally assigned the causes of action to the creditor and was not the plaintiff, thereby running counter to the "trustee" wording of the statute. DPI's argument therefore resolves itself into a dispute of whether what the Trustee seeks is a benefit to the estate, which this Court addresses in the next portion of this opinion.

---

**11.** 11 U.S.C. § 1123(b)(3)(B); *see Citicorp Acceptance Co., Inc. v. Robison (In re Sweetwater),* 884 F.2d 1323 (10th Cir.1989); *Retail Marketing Co. v. King (In re Mako, Inc.),* 985 F.2d 1052, 1054 (10th Cir.1993); *Temex Energy, Inc. v. Hastie & Kirschner (In re Amarex, Inc.),* 96 B.R. 330 (W.D.Okla.1989).

**12.** *In re Bargdill,* 238 B.R. 711 (Bankr. N.D.Ohio 1999), addressed a chapter 7 trustee's request to assign to a creditor preference causes of action and a cause of action on a note and mortgage. The court ruled that the wording of § 547(b) ("... the trustee may ...") precluded the assignment of the preference causes of action, but not of the note and mortgage cause of action. *Id.* at 720–22. In so ruling the court discussed policy reasons why this limitation was useful.

**13.** DPI's Motion for Summary Judgment and Memorandum of Law in Support of Motion, at 6–7 (doc 20, 21). This argument is at the heart of all the Defendants' arguments; *e.g.,* Wisconsin's Finest Motion for Summary Judgment at 4 ("Section 547 action was brought by the trustee in name and not in substance.") (doc 23).

In a variation of the same argument, citing *Congress Credit Corp. v. AJC Int'l,* 186 B.R. 555 (D.P.R.1995) and comparing *In re Sweetwater,* 884 F.2d 1323, DPI argues that, unlike a chapter 11 estate, a chapter 7 trustee may not assign causes of action for collection.[14] In literal terms, as DPI concedes, the Trustee has not assigned the causes of action. But beyond that, the Trustee is pursuing exactly the same goal that § 1123(b)(3)(B) was designed to accomplish: having an independent party pursue avoidances to pay administrative claims, thereby benefitting the estate. *Id.* at 1329–30. So while § 1123(b)(3)(B) by its terms is not applicable to this situation, the role the Trustee is playing in these avoidance actions is completely consistent with the Congressional intent evidenced in that Code section.

DPI also argues that there seems to be an unexplained but definite pattern in *S & D Foods, North Atlantic Millwork* and *Metal Brokers Int'l, Inc.* in which any collection that in part involves repayment to specific creditors impermissibly "taints" the plaintiff's efforts and therefore results in dismissal of the entire action. And this was the case even where the specific creditor had advanced the funds postpetition, thereby incontestably benefitting the estate.[15] This "Bermuda Triangle" pattern resolves itself into a series of decisions about whom the statute and traditional notions of standing permit to prosecute these actions. In each case the court found that the creditor was not authorized to bring the action and/or the trustee had previously given up that right: *S & D Foods,* 110 B.R. at 36 (creditor has no standing and debtor in possession had sold the causes of action to the creditor, so that there would be no benefit to the estate); *North Atlantic Millwork,* 155 B.R. at 281 (no statutory appointment of or authority for creditor Fleet to bring the action); *Metal Brokers Int'l., Inc.,* 225 B.R. at 921, 922 (same).[16] Thus, there is no need to fall back on the "to the extent that a transfer is avoided" language of § 550(a) in order to permit the Trustee to collect only one-third of the preferences, as DPI argues.[17]

Another question arises from the terms of paragraph 6 of the Settlement agreement, quoted above, which provides that the Trustee must consult with the Lenders before settling an action, and if they disapprove of the proposed settlement, the Trustee may nevertheless seek court approval, but without the usual "business judgment" presumption she is entitled to. This provision raises the issue of who in reality is the plaintiff in these actions. However, it is apparent that the ultimate control over whether to seek approval for any settlement lies solely with the Trustee, and that any party, including the Lenders, may oppose such a motion. That situation is no different than what the Code pro-

---

**14.** DPI's Motion for Summary Judgment and Memorandum of Law in Support of Motion, at 3–5 (doc 20, 21).

**15.** DPI made this point in oral argument and in its Response of Defendant DPI Food Products Company to Plaintiff's Supplemental Brief with Respect to the Issue of the Trustee's Standing, at 2–3 (doc 33).

**16.** As the Defendants feared, it appears that Fleet, after its experiences in *North Atlantic Millwork* and *Metal Brokers Int'l., Inc.,* may have finally gotten the hang of this process.

**17.** Response of Defendant DPI Food Products Company to Plaintiff's Supplemental Brief with Respect to the Issue of the Trustee's Standing, at 3 (doc 33). Reliance on the quoted language would not accomplish the goal anyway. "The words 'to the extent that' in the lead to this subsection are designed to incorporate the protection of transferees found in proposed 11 U.S.C. 549(b) and 548(c)." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), at 376, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6332.

vides. *See* Bankruptcy Rule 9019(a). The only difference is that the Trustee, in any such litigation, is deprived of the benefit of the business judgment rule. *E.g., United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co., Inc.),* 289 B.R. 269, 282 (1st Cir. BAP 2003)(Compromises are generally approved if they meet the trustee's business judgment).[18] Unquestionably this provision diminishes the authority of the Trustee, but not so much so that in effect she is no longer representing the estate and not in control of the litigation.

The parties also argue whose interests the Trustee is supposed to represent in her capacity as Trustee. *Compare, e.g., Congress Credit Corp. v. AJC Int'l,* 186 B.R. 555, 559 (D.P.R.1995) ("[U]nlike a Chapter 11 trustee, a Chapter 7 trustee represents the interests of the unsecured creditors and *not* the secured creditors." Emphasis in original; citation omitted.) *with United Pacific Insurance Co. v. McClelland (In the Matter of Troy Dodson Constr. Co., Inc.),* 993 F.2d 1211, 1216 (5th Cir.1993) ("The trustee owed a fiduciary duty to *all* the creditors, not just to the unsecured creditors." Emphasis in original.) The Court need not resolve this age-old bankruptcy argument because the issue is really beside the point. If the Trustee is complying with the terms of the settlement agreement (and no one argues that she is not), then the remaining question is whether she is complying with the two prongs of the § 550(a) test. In light of the foregoing, the Trustee has met the first prong of the test.

*Benefit to the estate:*

■ "Specifically, after demonstrating the *right* to recover conveyances ..., a trustee must then establish the *amount* of recovery under section 550(a) of the Bankruptcy Code, which provides that, 'to the extent that a transfer is avoided ..., the trustee may recover, *for the benefit of the estate,* the property transferred.'" *Acequia, Inc. v. Clinton (In re Acequia, Inc.),* 34 F.3d 800, 809 (9th Cir.1994). (Emphasis in original.)

■ "Benefit to the estate", like the phrase "good faith", is not a defined term or phrase in the Code. Although the language of some cases, *e.g., Tennessee Wheel & Rubber Co. v. American Express Travel Related Services, Co., Inc.,* 75 B.R. 1 (M.D.Tenn.1987) and *Weaver v. Aquila Energy Marketing Corp.,* 196 B.R. 945, 956 (S.D.Tx.1996), and of some of Defendants' arguments[19] would suggest that "benefit to the estate" means essentially "payment to general unsecured creditors", "[t]he term 'estate' is broader than the term 'creditors'". *NextWave Personal Communications, Inc. v. Federal Communications Commission (In re NextWave Personal Communications, Inc.),* 235 B.R. 305, 308 (Bankr.S.D.N.Y.), *aff'd* 241 B.R. 311 (S.D.N.Y.), *rev'd on other grounds* 200 F.3d 43 (2nd Cir.1999), *citing Trans World Airlines, Inc. v. Travellers Int'l A.G. (In re Trans World Airlines, Inc.),* 163 B.R. 964, 972 (Bankr.D.Del.1994). A better working definition would be that the estate benefits when the action increases the value or assets of the estate. "The basic purpose of a recovery pursuant to § 550(a) is to enlarge the estate for the benefit of

---

**18.** The settlement agreement provides that the Lenders similarly are deprived of deference to their business judgment. The Court is not clear what deference is referred to.

**19.** *E.g.,* ConAgra's Brief in Support of Defendants' Motion for Summary Judgment, at 4–9

(doc 32); ConAgra's Reply Brief in Support of Defendants' Motion for Summary Judgement and in Opposition to Chapter 7 Trustee's Cross–Motion for Summary Judgment on the § 550 Standing Issue, at 2–6 (doc 40).

creditors." *Id.,* at 973. "What matters is whether unsecured creditors will receive '. . . some benefit from the recovery of the preferences, even if it is not an increase in the amount the creditors will receive.'" *Funding Sys. Asset Mgmt. Corp. v. Chemical Business Credit Corp. (In re Funding Sys. Asset Mgmt. Corp.),* 111 B.R. 500, 523 (Bankr.W.D.Pa.1990). (Even that definition is too narrow, in light of some of the cases; *e.g., Enserv Co., Inc. v. Manpower, Inc. (In re Enserv Co., Inc.),* 64 B.R. 519, 521 (9th Cir. BAP 1986), *aff'd without opinion* 813 F.2d 1230 (1987) ("There is no statutory requirement that unsecured creditors or even the estate benefit from the voiding of a preference.").) Given the circumstances of this estate, increasing the assets of the estate is a sufficiently useful definition.

 Whether the recovery of an avoidance will benefit the estate is determined on a case-by-case basis. *E.g., Wellman v. Wellman,* 933 F.2d 215, 218 (4th Cir.), *cert. denied* 502 U.S. 925, 112 S.Ct. 339, 116 L.Ed.2d 279 (1991); *Weaver v. Aquila Energy Mktg. Corp.,* 196 B.R. at 956; *Barber v. McCord Auto Supply, Inc. (In re Pearson Industries, Inc.),* 178 B.R. 753, 758 (Bankr.C.D.Ill.1995); *Tennessee Wheel & Rubber Co. v. Captron Corporate Air Fleet (In re Tennessee Wheel & Rubber Co.),* 64 B.R. 721, 726 (Bankr.M.D.Tenn.1986), *aff'd* 75 B.R. 1 (M.D.Tenn.1987).

 "[Section] 550's benefit to the estate requirement is satisfied once there is an identifiable benefit." *Weaver,* 196 B.R. at 957 (increased distribution of less than 1% to unsecured creditors constituted sufficient benefit to the estate); *see, e.g., Sweetwater,* 884 F.2d at 1327 (recovering avoidance claims to pay administrative claims will benefit estate), *cited in In re Mako,* 985 F.2d at 1056; *Trans World Airlines, Inc.,* 163 B.R. at 973 ($13 million recovery, payable to secured creditor who

provided financing to chapter 11 estate of multi-billion dollar company, will benefit unsecured creditors as shareholders and noteholders by enhancing value of the reorganized debtor); *In re Funding Sys. Asset Mgmt. Corp.,* 111 B.R. at 523–24 ("Recovery by Debtor will redound to the benefit of the unsecured creditors in that recovery will improve Debtor's 'financial health' by increasing its assets and therewith the likelihood that Debtor will be able to meet its obligations under the Plan."); *Centennial Indus., Inc. v. NCR Corp. (In re Centennial Indus., Inc.),* 12 B.R. 99, 102 (Bankr.S.D.N.Y.1981) (Act case; "The recovery of this preference will be additional security for the fulfillment of the debtor's plan."); *City Nat'l Bank & Trust Co. v. Oliver,* 230 F.2d 686, 689–690 (10th Cir. 1956) (in a Chapter XIII arrangement, the trustee could avoid a mortgage on the debtor's television because, were the confirmed plan to fail, the creditors would lose the incremental value of the television); King et al., 5 Collier on Bankruptcy (15th Ed. Rev.2002), ¶ 550.02[2] at 550–7 ("If the recovery will have some positive benefit to the estate or its creditors, however, recovery may be had even if such benefit is indirect.") (Footnote omitted.)

 The Trustee's recovery of these avoidances, all of them, will permit her at a minimum to pay a significant percentage of the chapter 11 administrative expenses. That intended distribution is unarguably a benefit to the estate. *Sweetwater,* 884 F.2d at 1327; *Matz v. Hoseman,* 197 B.R. 635, 641 (N.D.Ill.1996) (action by chapter 7 trustee and United States Trustee for disgorgement in order to pay chapter 11 administrative expenses); *Silverman Consulting, Inc. v. Hitachi Power Tools, U.S.A., Ltd. (In re Payless Cashways, Inc.),* 290 B.R. 689, 696–97 (Bankr.W.D.Mo.2003) (chapter 11 trustee's action to recover preferences to

pay chapter 11 administrative expenses allowable as benefitting the administratively insolvent estate).

What is dispositive for the Court in these cases is the effect of paragraph 7 of the settlement agreement which allocates to the estate the risk of loss on this issue: if the Trustee may not recover some or all of the avoidances for delivery to the Lend-ers, then the estate must use other resources to pay the $2.3 million to the Lenders. In other words, a dollar not paid or delivered to the Lenders by means of the two-thirds assignment provision is a dollar lost to the estate for payment of other chapter 11 administrative expenses. *See Trans World Airlines,* 163 B.R. at 973 ("If a $13 million payment to Icahn [the post petition lender] does not come out of the recovery, then it will necessarily come out of other TWA assets."). Indisputably the two-thirds payment to the Lenders coming from these and other defendants rather than estate assets, would constitute a "benefit to the estate" in a very real sense. In consequence, the Trustee's recovery of these avoidances, and the payment of a portion of the proceeds to the Lenders, meets the requirements of § 550(a).[20]

Nabisco, S.C. Johnson and Mead Johnson argue that § 550(a) is unambiguous and that unambiguous language precludes recovery of any portion of the proceeds not going to the estate.[21] They cite *Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) for the dictate that courts must "look first to the statutory language and then the legislative history if the statutory language is unclear". The dictate is undisputable; its application to these facts and Defendants' conclusion therefrom are not.

The language of § 550(a) is not unambiguous. Nabisco argues that the statute clearly states that, in this case, the Trustee can only recover those portions of the avoided transfers which go directly to the estate; to wit, the collection costs, the three percent commission and the one-third. She cannot collect the two-thirds that goes to the Lenders. That reading of the statute would paraphrase it to say "the trustee may recover only that property which will go to the estate", or perhaps, more narrowly, "the trustee may recover only that property which will go to the estate for payment of unsecured claims". But the wording of the statute can as easily be paraphrased to read "the trustee may recover property if the recovery will benefit the estate". And under that interpretation, a collection program which has the Trustee collecting all the proceeds of the avoidances and distributing some (but not all) of the proceeds to the Lenders, even pursuant to a pledge agreement, is permitted by the statute.

ConAgra argues that Congress could have worded the statute to say explicitly "if the estate benefits" but that it chose the different wording, thus showing that the "if the estate benefits" approach was one that Congress in effect rejected.[22]

---

**20.** The foregoing conclusion means that the Court need not determine generally at what level the benefit to the Lenders is so large and the benefit to the estate so small that in effect, there is no benefit to the estate. Were there a need to make that determination, the Court could rely on *Dolese v. United States,* 605 F.2d 1146, 1154 (10th Cir.1979): "There is a principle of too much; phrased colloquially, when a pig becomes a hog it is slaughtered."

**21.** *E.g.,* Defendants' Supplemental Brief Regarding Bankruptcy Code § 550 Standing Issue, at 2–3 (doc 45).

**22.** Supplemental Brief in Support of [ConAgra's] Motion for Summary Judgment and in Opposition to Chapter 7 Trustee's Cross–Motion for Summary Judgment on the § 550 Standing Issue, at 2 (doc 48).

But that argument only works if the premise is that the current language is unambiguous and cannot reasonably be read to say "if the estate benefits". As is apparent, the Court considers the language in the statute ambiguous, capable of either interpretation, and thus disagrees with ConAgra.

An ambiguous statute can be interpreted by knowing the purpose behind the statute. *Allen v. Geneva Steel Company (In re Geneva Steel Co.),* 281 F.3d 1173, 1178 (10th Cir.2002). Given the choice of interpreting the statute's language "for the benefit of the estate" narrowly or broadly, the Court chooses the latter. At least in part this is because the Code gives a trustee a variety of mechanisms to permit her to fulfil a primary goal of the bankruptcy process; namely, to pursue as equal a distribution of assets to creditors as possible by undoing prepetition transactions that have the effect of favoring one creditor over another. *See Begier v. Internal Revenue Service,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990)(Section 547(b) furthers a central policy of the Bankruptcy Code that creditors of equal priority should receive pro rata shares of the debtor's property.) "When a debtor corporation has made a transfer of its assets which results in the preference of one or more creditors over others, the purpose of an action against those transferees is to return assets to the debtor's estate for equitable distribution to all creditors." *Delgado Oil Co., Inc. v. Torres,* 785 F.2d at 861. Given this goal, the language of the Code should be interpreted to permit a trustee to engage in litigation and transactions which generally will result in a more even distribution of the debtor's property among its creditors and specifically will allow the estate to benefit from the proceeds of these avoidances (should there be any).

The parties seem to agree that there is no case that is on all fours with the facts in this case; that is, a chapter 7 trustee seeking to pursue avoidance actions in order to pay part of the proceeds to creditors holding claims secured in part by a pledge of the avoidance actions, and to keep part of the proceeds to pay (other) estate obligations. (And the Court is confident that the existence of such a case would in any event not have stemmed in the least the flood of argument that has accompanied the raising of the issue.)

The collection by the Trustee of the avoidance actions, even with the concomitant obligation to pay a portion of the proceeds to the Lenders, benefits the estate. This is so, whether the Trustee's efforts to make payments to the Lenders are considered direct collections on their behalf, or whether the Trustee's efforts are considered the equivalent of paying an administrative claim of the estate. The Lenders and the estate could have negotiated for the Lenders to have instead a superpriority claim in the first instance, rather than a lien on the avoidance actions, and in that circumstance, no one could have objected to the Trustee's pursuing the avoidance actions to repay such an administrative claim against the estate. Indeed, the priorities for payment of claims in a chapter 7 case make that a duty of a trustee. § 726(a)(1). And in any event, if the Trustee is not permitted to pay these claims as secured claims, the claims will be treated as superpriority administrative claims, by terms of the settlement agreement. That being the case, it is exalting form over substance to say that the Trustee should not be allowed to repay these secured claims. And since her collection efforts are not solely for the secured creditors (although even if they were, those collection actions would still be permissible; *see below* at pages 28–29), she is within her rights and duties to pursue

these actions and make the distributions required therefrom.

Defendants have argued that at a minimum the Trustee should not be allowed to collect and pay over the two-thirds share allocated to the Lenders. But enforcing that alternative payment regime would in effect be the same as not permitting the Trustee to collect any of the funds, since the terms of the settlement agreement require that the Trustee pay two-thirds of any net collection to the Lenders; continually reducing the amount collected by two-thirds leads to a collection of nothing, at which point the Trustee is required to pay the Lenders their superpriority claim from other assets of the estate. The answer to this conundrum is that the "benefit to the estate" requirement of § 550(a) should not be read so narrowly, but rather in a broader sense, as explained above. And the same answer—that there is benefit to the estate—applies to the arguments of those Defendants who limit their demand for dismissal to only the first two-thirds of any recovery committed to the Lenders.

Defendants also focus on the difference between a chapter 11 debtor in possession or representative of the estate, and a chapter 7 trustee. Cases such as *In re Pearson Industries, Inc.* 178 B.R. at 760 and *Congress Credit,* 186 B.R. at 559, recite a three-part "test" for determining benefit to the estate, the first part of which is whether the plaintiff is a chapter 11 trustee or a chapter 7 trustee. The status of the plaintiff is merely one factor to consider in the overall, and rather more simple and direct, inquiry about whether the transactions, viewed as a whole, benefit the estate. Thus one need not examine the status of the plaintiff to decide that obtaining the proceeds of recoveries for the debtor in a solvent chapter 7 case probably does not benefit the estate, whereas doing so in order to strengthen the ability of a reorganized debtor to pay its plan obligations probably would. In any event, it is easily concluded that collecting avoidance proceeds in a chapter 7 case to repay chapter 11 administrative expenses, even secured ones, benefits the estate.

In a variety of circumstances courts have refused to find a benefit to the estate, but for the most part, these cases are distinguishable on their facts. The Court disagrees with the others.

To begin with, this instant action is one in which the recovery is sought for both the estate and the Lenders. In consequence, the Court need not determine whether an avoidance action can be maintained if the entire proceeds go to the secured creditor. *See, e.g., Pearson Industries,* 178 B.R. at 765 (no benefit to the estate when all the proceeds sought by the trustee would be paid to the secured creditors by virtue of their senior lien on the inventory at issue in the avoidance action) *and Congress Credit,* 186 B.R. at 560 (no benefit to estate when secured creditor obtained a judgment for all the proceeds of the avoidance actions); *contra, In re Enserv Co., Inc.,* 64 B.R. at 520–21 (permitting debtor-in-possession's avoidance action to go forward when all likely proceeds would be paid to secured creditor for its post-petition financing of estate). In both *Pearson Industries* and *Congress Credit,* the senior secured positions of the secured creditors in the collateral which the trustee sought to recover, left no equity whatever for the estate. The trustee in those cases was acting "as a mere conduit for the benefit of secured creditors only", *Pearson Industries,* 178 B.R. at 761. There was no benefit whatever to the estate.

But even if all the recoveries were to go to the Lenders, there is adequate authority that permits that result if there has been or will be some benefit to the estate. *E.g., Trans World Airlines, Inc.,* 163 B.R. at

973 ($13 million recovery, payable to secured creditor who provided financing to chapter 11 estate); *DuVoisin v. East Tennessee Equity, Ltd. (In re Southern Indus. Banking Corp.),* 59 B.R. 638, 641 and n. 5 (Bankr.E.D.Tenn.1986) (recovery of avoidances operated to increase the assets of the successor corporation, whose shares had been distributed to creditors as a partial dividend); *Tennessee Wheel & Rubber Co.,* 64 B.R. at 726 (exercise of avoidance powers permitted repayment of line of credit used to pay claims); *see In re Acequia,* 34 F.3d at 812 (recovery of fraudulent transfer permitted even when the creditors had been fully repaid; recovery would secure repayment of long-term note owed by estate and reimburse attorney fees incurred by the estate in pursuing the avoidance action). Thus, even if the Court were only to focus on the portion of the avoidance proceeds that were going to the Lenders, which in a real sense is what Defendants argue when they suggest that the Court ought to not permit the Trustee to recover such portion of the avoidances as will be paid to the Lenders, there would still be sufficient reason and authority to permit those recoveries in light of paragraph 7 of the Settlement agreement.

■ The classic Act case finding no benefit to the estate and therefore dismissing the avoidance action is *Whiteford Plastics Co. v. Chase Nat'l Bank of New York City,* 179 F.2d 582 (2nd Cir.1950).[23] The debtor confirmed a chapter XI plan of arrangement, pursuant to which the creditors received cash or stock for their claims. Prior to confirmation of the plan and payment to the creditors, the debtor had initiated an action to avoid the liens on two generators because the bank had failed to

perfect its security interests. The court of appeals found that "the creditors have received cash or stock for their claim, and there is no reason to safeguard their rights further." *Id.,* at 584. The court ruled as follows:

> "The contention ... that the debtor was really contributing the value of the steam generators to the creditors when offering the plan of reorganization which they finally accepted seems without substance. The debtor certainly did not intend to give the creditors the benefit of any such value when it sought to set aside the conditional sale and appropriate the generators to its own use."

179 F.2d at 585. Although a later court faced with these same facts might have considered whether the debtor's voiding of the liens on the generators might have increased the value of the debtor for its new stockholders, *see, e.g., In re Funding Sys. Asset Mgmt. Corp.,* 111 B.R. at 523–24, such a finding in this case was precluded by the specific ruling that the debtor had no intent to benefit the creditors. That specific ruling differentiates *Whiteford Plastics* from this case.

The Tenth Circuit distinguished *Whiteford Plastics* in *City National Bank & Trust Company v. Oliver,* 230 F.2d 686, a case in which the debtor had confirmed his chapter XIII plan and then sought to void the bank's lien on his television. Since nothing in the plan required the television to be sold to fund the plan, it seems apparent that the debtor was pursuing the avoidance action for himself alone, although the trustee joined him in pursuing the avoidance. And in fact, the bank ar-

---

**23.** Although both *Whiteford Plastics* and *Oliver* arose before the enactment of the Code, they are instructive since they employ the standard of "benefit to the estate". "A key rule of construction for the Bankruptcy Code

is that judge-made doctrines developed under the former Bankruptcy Act are presumed to be carried forward except to the extent Congress indicated a contrary intent." *In re Godon,* 275 B.R. at 563. (Citation omitted.)

gued that dismissing the avoidance action would allow the bank to repossess the television and thereby eliminate a secured claim against the estate. Despite the apparent benefit to the estate arising from *not* allowing the avoidance action to go forward, the court ruled that the referee *might* allow the bank a secured claim instead of letting the bank take back the television, or the chapter XIII plan *might* fail and the debtor might convert to a chapter VII and the television, if still collateral for the Bank's claim, would then not be available to be liquidated, so that the creditors would be harmed. *Oliver* is a case in which the Tenth Circuit went some distance, stretching into speculation, in the search for a benefit to the estate to justify the avoidance action.

*Harstad v. First American Bank,* 39 F.3d 898 (8th Cir.1994), *Wellman,* 933 F.2d 215, and *Dunes Hotel Assocs. v. Hyatt Corp. (In re Dunes Hotel Assocs.),* 194 B.R. 967 (Bankr.D.S.C.1995), all closely resemble *Whiteford Plastics.* In *Harstad,* the chapter 11 debtors in possession, after confirming a plan which did not rely in any way on (indeed, did not mention) the avoidance recoveries, sued the bank for a preference. The Harstads argued that recovery of the avoidance would make it easier for them to fulfil their plan obligations, even though none of the proceeds would go to the creditors. 39 F.3d at 904. After pointing out that the Harstads had testified in support of the feasibility of their plan without mentioning the avoidance recoveries, and that the bankruptcy court had found the plan was feasible, *id.,* the court of appeals ruled that

"[s]imply arguing that the recovery of a preference may make it easier for the debtors to fulfill their obligations under the already confirmed Plan—a plan that was not accepted by the Harstads' creditors in reliance on or in anticipation of

such a recovery—is inadequate to show a benefit to the estate under § 550(a)." *Id.,* at 905. (The court also ruled that the plan did not designate the Harstads as representatives of the estate pursuant to § 1123(b)(3)(B), and so they also lacked standing. *Id.* at 901–03.) What is also just barely under the surface of this case is the court's suspicion about the good faith of the debtors, who took almost 2½ years to file a disclosure statement and confirm a plan that said that the debtors had not analyzed whether there were preferences available, and then filed preference actions for over $800,000.00 within three months of confirmation. *Id.* at 901, 903. The court explicitly stated that the benefit to the creditors need not be direct, *id.* at 905, but nevertheless held that the debtors in that case needed to have shown a more definite benefit to the estate. *Id.* What the court of appeals was forbidding was the debtors' scheming to save the preferences for themselves; the debtors' assertions of benefit to the estate were clearly insubstantial when held up to the hard realities of what they had done.

In *Wellman v. Wellman,* the chapter 11 debtor in possession filed schedules disclosing assets of about $13 million and liabilities of about $8 million. After confirming his plan, the debtor promptly paid the unsecured claims in full with interest and the administrative claims. He then paid the secured claims about 60% in cash (which payments included interest and attorney fees), gave the secured creditors the collateral that had secured their notes, and also gave those creditors nonrecourse notes totaling $600,000, to be paid solely out of the proceeds of two lawsuits. The debtor was free to abandon the lawsuits, and would only owe some or all of the $600,000 if he obtained a net recovery or if he received a settlement offer on the lawsuits acceptable to his creditors but which he rejected. One of the lawsuits he aban-

doned; the other included the § 548 avoidance claim that produced the motion to dismiss and the subsequent appeal. 933 F.2d at 216–17. The trial court found, and the court of appeals agreed, that, among other things, the secured creditors received cash and collateral sufficient to satisfy their claims, and that the non-recourse notes were an attempt to create a claim in the estate so that he could obtain a "massive surplus recovery" for himself. *Id.* at 219. The secured creditors would have accepted the plan without the non-recourse notes, and the debtor had absolute discretion to pursue or drop the lawsuits which were the only source of repayment of the notes. Most important, while maintaining the § 548 action, the debtor distributed to himself, with the court's approval, surplus cash and property worth over $2,500,000.00, more than four times the amount of the non-recourse notes. *Id.* Not surprisingly, in the face of such a transparent ruse, neither the trial court nor the court of appeals found any merit to the debtor's contention that the estate would benefit from the avoidance action. What the *Wellman* case stands for, at a minimum, is that the assertion of benefit to the estate needs to have behind it some semblance of real need on the part of the estate. Just as clearly as Wellman could demonstrate no such need, the Trustee in this case can demonstrate a considerable need.

Finally, in *Dunes Hotel Assocs.*, the assets of the chapter 11 debtor in possession exceeded its liabilities. Nevertheless, the debtor filed an avoidance action to set aside an unrecorded leasehold interest pursuant to § 544(a) on a $52,000,000 property. The debtor had three creditors, one whose claim was oversecured, the second with a relatively small debt ($30,000) that could easily be paid by the solvent debtor out of its operations, and the third an insider law firm holding an unsecured

claim for about $2,200. 194 B.R. at 985–86. The fact that the law firm refused to give up its claim even for a payment of double the amount of the claim led the court to conclude that the law firm's claim was artificially created or preserved for the debtor's benefit. *Id.*, at 986. The court easily found that the debtor had not met its burden of showing how the avoidance action would confer any benefit on the estate. *Id.* at 987. As with *Harstad* and *Wellman, Dunes Hotel Assocs.* is of little precedential value since its facts are so precisely the opposite of the circumstances faced by the Trustee in this case.

In *Burlington Motor Carriers Inc. v. MCI Telecom. (In re Burlington Motor Holdings, Inc.)*, 231 B.R. 874 (Bankr. D.Del.1999), the confirmed plan transferred to the successor corporation the estate's causes of action pursuant to § 1123(b)(3)(B). The plan also provided that the creditors would be paid from the proceeds of a note from the successor corporation, and that the obligation to make those payments was not dependent in any way on the successful collection of the avoidance actions. The recoveries would only benefit the successor corporation, *id.* at 877, and would not be paid to the creditors. *Id.* at 878. The court had also determined that the plan was feasible without any reference to the recoveries. *Id.* The court therefore found that the recoveries would not benefit the estate, and ruled that the successor corporation did not have standing to pursue them.

The successor corporation argued that the assets were transferred and assigned in exchange for the obligation to make the payments on the note. The court dismissed this argument by saying that the benefit to the creditors derived only from the successor corporation's liability on the note. It also cited *Harstad*, 39 F.3d 898, for the proposition that the "indirect bene-

fit" to the paying party, who had a fixed obligation to the creditors, was not a sufficient benefit to the estate.

The *Burlington Motor* decision, like the *S & D Foods* and *North Atlantic Millwork* decisions discussed below, does not adequately address the issue of the exchange of consideration between the successor corporation and the estate. Clearly the note to pay the creditors was a benefit to the estate, and the giving of that note was inextricably bound up with the assignment of the avoidance actions. Thus the collection of the avoidance recoveries was part of the transaction that benefitted the estate, and only by ignoring the whole of the transaction could the court find that the collection of the recoveries did not benefit the estate.

*Consolidated Pet Foods, Inc. v. Millard Refrigerated Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34 (Bankr.D.Col. 1990) makes the same analytical error. Pursuant to an asset purchase agreement approved by the court, the estate assigned, among other things, its avoidance causes of action to Consolidated Acquisitions, Inc. ("CAI"). *Id.* at 35. Since the assignment was not done pursuant to a plan and § 1123(b)(3)(B), it was "clear beyond cavil" that CAI could not assert the avoidance actions. *Id.* at 36. But then the court went on to find that, in addition, there was no benefit to the estate from the recovery of the avoidances. "[O]nly CAI will benefit from the process of any such avoidance actions because in the purchase of the assets from the Debtor it guaranteed that unsecured creditors would receive 50% of their claims (capped at a total of $2.5 million for all unsecured claims) and no more." *Id.* Despite appearing to have accepted CAI's characterization of the transaction (" 'CAI has in effect paid the estate up front for the proceeds of the avoidance claims by agreeing to pay 50% of all unse-

cured claims and other substantial consideration.' "), the court advised CAI not to try to undo this transaction even though it did not yield the anticipated consideration. *Id.*

By ignoring the larger context of the contract between the estate (representing the creditors) and CAI, the court too narrowly viewed what was the benefit to the estate. It thus misapplied § 550(a).

In *North Atlantic Millwork*, 155 B.R. 271, the court had approved a borrowing order which pledged to the lender (Fleet) the estate's avoidance causes of action. A subsequent asset sale order approved the transfer to Fleet of the avoidance causes of action, and ostensibly authorized Fleet to pursue them, in return for cash payments to the estate of somewhat more than $200,000. A recitation in the sale order stated that the creditors would receive nothing on liquidation. Relying on *S & D Foods*, the court ruled that there had been no § 1123(b)(3)(B) appointment of the lender/purchaser to prosecute the avoidance actions and therefore Fleet had no standing, *id.* at 281, and that the borrowing and asset purchase orders could not be substituted for a confirmed plan with a § 1123(b)(3)(B) provision in it. *Id.* at 283. The court went on to rule that "the Sale Order did not address, let alone purport to bar, the rights of preference defendants to contest Fleet's standing". *Id.* at 284. And, as in *S & D Foods*, the court also found that because the estate had absolutely assigned the causes of action to a third party, the trustee no longer had standing to assert those actions, and thus joinder of the trustee as a plaintiff in the adversary proceedings would not change the result. *Id.* at 282–83. Thus, despite the court's discussion of benefit to the estate, *id.* at 281–83, and its finding that there was "no benefit, let alone a *substantial* benefit, to unsecured creditors from

the sale", *id.* at 284 (emphasis in original), the decision really turned on whether the estate and Fleet had complied with the dictates of the statute about who could file such an action.

Nevertheless, the finding by the *North Atlantic Millwork* court that there was no benefit to the estate, even if *dicta,* is puzzling. The court conceded that administrative expenses of $110,000 were to be paid, but pointed out that the note, unguaranteed and unsecured, was not from Fleet but a related entity, and that payments, capped at $125,000, were due to start a year or so later. Why these arrangements in themselves were not considered beneficial to the estate is not clear, unless that was the court's way of saying that Fleet itself, on the face of the transaction, was not providing the consideration to the estate and thus should not have standing. Regardless of whether the court considered the amount of the consideration sufficient or "substantial", the $200,000 paid and to be paid to the estate was not *de minimis, cf. Weaver,* 196 B.R. at 957 (increased distribution of less than 1% to unsecured creditors constituted sufficient benefit to the estate), and in any event the court presumably found the exchange of consideration to be fair to the estate when it approved the sale. And whether the consideration to the estate came directly from Fleet or from an obviously related entity should have made no difference.

Part of the analytical problem with *S & D Foods, Burlington Motors, North Atlantic Millwork* (155 B.R. at 283, where the court appears to say that the note payments being due in the future means there is no benefit to the estate), and *Sapolin Paints,* 11 B.R. at 932, 937 (despite assignees having paid estate $2,600,000 for assignment of avoidance causes of action, court found no benefit to estate) is that

they might have had a different outcome had the plan provided that the recoveries would have to be made before the payments were made. For example, if the successor corporation in *Burlington Motors* had not been obligated to make any payments until and unless it had collected on the avoidance actions, it would have been quite difficult to argue that the collection of the avoidances was not for the benefit of the estate. But it should not make a difference whether the assignee pays the consideration before or after the collections; indeed, from the estate's point of view, it is even more beneficial for the assignee to make the payments beforehand (and presumably earlier) rather than afterward, and for the payments to be mandatory rather than contingent. *Cf., e.g., Winston & Strawn v. Kelly (In re Churchfield Mgmt. & Inv. Corp.),* 122 B.R. 76, 82 (Bankr.N.D.Ill.1990) ("There is nothing in the Bankruptcy Code or precedent which indicates that the 'benefit' to the estate and its creditors cannot occur prior to the actual recovery on a claim for § 1123(b)(3)(B) purposes."), *quoted in North Atlantic Millwork,* 155 B.R. at 282; *Pearson Industries,* 178 B.R. at 760 ("Benefit to the estate ... may encompass past benefits to the estate which might have occurred prior to the actual recovery on a claim."); *Tennessee Wheel & Rubber,* 64 B.R. at 726 (debtor's collection of avoidances used to repay creditor's postpetition and post-confirmation lending to estate).

*In re Mako,* 985 F.2d at 1055–56 is not to the contrary. In that case, the court found that while RMC ("a stranger to the estate", *id.* at 1054) was authorized by the plan to *initiate* avoidance actions, "the plan [also] created the office of a 'Litigation Trustee,' who was authorized to 'act on behalf of all unsecured creditors.'" *Id.* at 1055. In consequence, the court found that RMC had not provided clear evidence of the reservation to it of the estate's

avoidance powers. *Id.* The court also found that it was uncontested that RMC's recoveries were only to repay itself for previously paying administrative expenses. *Id.* at 1056. Because this finding follows the ruling that RMC could not be deemed the representative of the estate, the finding about lack of benefit to the estate is probably dicta, and the case therefore would not stand for the proposition that collecting on avoidance actions to repay a previous advance to the estate would in itself be forbidden, as is argued by some Defendants.[24] And in any event, the fact that the avoidance recoveries in this case will directly benefit the estate distinguishes the "benefit" ruling of *In re Mako.*

The rulings in *S & D Foods, Burlington Motors* and *North Atlantic Millwork* may also have an adverse impact that goes beyond the unfairness to the purchaser and the misapplication of the statute; that is, these rulings will limit the flexibility of estates to obtain payments for creditors. That creditors may be quite satisfied to obtain the assurance of a 50% payment on claims, immediately or over time but without any other conditions (including any conditions based on recovery of avoidances), is hardly debatable. Yet the ruling in *S & D Foods* and similar cases will chill if not preclude such agreements in the future, a result that surely is not a benefit to any estate.

A final note concerning how courts in the Tenth Circuit have analyzed this standing issue: *Sweetwater,* 884 F.2d at 1326-27, *In re Mako,* 985 F.2d at 1054, *In re Amarex,* 96 B.R. at 334, *North Atlantic Millwork,* 155 B.R. at 281, and *S & D Foods,* 110 B.R. at 36, appear to conflate the issues of representation of the estate with benefit to the estate.

"That test is as follows: 'Under § 1123(b)(3)(B), a party who is neither the debtor nor the trustee but who seeks to enforce a claim must establish two elements: (1) that it has been appointed; (2) that it is a representative of the estate.' [*In re Amarex*] at 334. The first element requires that the appointed party be approved by the court, which can be accomplished simply by approval of the plan. *Sweetwater,* 884 F.2d at 1326. Determining a party's representativeness under the second element is more involved. It requires the court to decide 'whether a successful recovery by the appointed representative would benefit the debtor's estate and particularly, the debtor's unsecured creditors.' *Id.* at 1327 (internal quotations omitted)."

*In re Mako,* 985 F.2d at 1054. None of the parties contests the proper appointment of the trustee to her position in this case. However, whether a party represents the estate and whether the pursuit of the avoidance action will benefit the estate are two separate issues. For example, one can imagine a situation in which a party purports to represent the estate (and is in fact authorized to do so) but the collection of the avoidance action would still not benefit the estate. *E.g., McCord v. Agard (In re Bean),* 251 B.R. 196, 206 (E.D.N.Y. 2000), *aff'd* 252 F.3d 113 (2nd Cir.2001)(the estate had no interest in the chapter 7 trustee's avoidance of the debtor's unauthorized postpetition sale of the debtor's house, when the house was sold for fair market value, the net proceeds had been turned over to the trustee, but the action was brought to punish the debtor). On the other hand, perhaps *Sweetwater, Mako, Amarex* and other such cases should be read to mean that the "appointment" portion of the test refers to the trustee as

---

**24.** Defendants' [Nabisco, S.C. Johnson and Mead Johnson] Reply to the Trustee's Brief Regarding Bankruptcy Code § 550 Standing Issue, at 3–4 (doc 46).

plaintiff ["... the trustee may ..."], and the "representativeness" portion refers to the benefit to the estate ["... for the benefit of the estate ..."].

The Trustee has met her burden of showing that the prosecution of these avoidance actions benefits the estate.

*Miscellaneous:*

Wisconsin's Finest argues that the Trustee does not meet the test of § 547(b) ("... the trustee may avoid any transfer of an interest of the debtor ..."), in that the release of the estate of liability for $2,000,000 constituted in effect a payment to the Lenders of that amount, and that any collection from Wisconsin's Finest is included in the $2,000,000 and therefore the estate has no interest in the recovery from Wisconsin's Finest.[25] In essence, the chapter 11 estate borrowed about $4.25 million from the Lenders, and in the settlement agreement, the parties liquidated and settled the estate's preference claim against Fleming by reducing the estate's liability to the Lenders by the $2,000,000.

> "This reduction reflects the settlement of the allocation issue asserted by the Trustee and others, to wit: that a portion of the Fleming sale proceeds was allocable to the release of a potential preference action allegedly held by the Estate against Fleming, and that the Lenders should not have received that portion of the sale proceeds because at that time they did not hold a security interest in proceeds of Avoidance Actions."

Settlement agreement, at 9. If the $2,000,000 is understood simply as a credit to the estate in this manner, the estate still retains an interest in the amount it seeks to collect from Wisconsin's Finest.

The Trustee has also argued that Defendants should be charged with having notice of the settlement agreement and not having objected timely to its entry, so that they are now precluded from raising the standing issue. Given the disposition that the Court makes of the motions to dismiss for standing, the Court need not address that issue.

 Finally, various Defendants have vigorously argued the unfairness they perceive in the fact that their continued supplying of the debtor prepetition kept the debtor alive and led to the Lenders being further secured.[26] For example, ConAgra submitted a memorandum dated February 5, 2001 obtained from the files of Heller Financial, Inc., which discusses the Debtor's imminent filing, the terms of potential postpetition lending, and a plan to sell the Debtor's assets.[27] The Trustee also argues fairness, asserting among other things that the settlement agreement was approved by the Court and now is not the

---

**25.** Defendant's Reply to Chapter 7 Trustee's Response to Defendant's Motion for Summary Judgment and Response to Trustee's Cross–Motion for Summary Judgment on the § 550 Issue, at 3–4 (doc 29).

**26.** *E.g.,* Reply of Defendant DPI Food Products Company to Plaintiff's Response to DPI's Motion for Summary Judgment and Response to the Cross–Motion for Summary Judgement of Trustee on the § 550 Standing Issue, at 8 (doc 29):

> "The secured party here advanced funds to the debtor so the debtor could make pay-

ment to the suppliers, with the effect that the suppliers would be misled into extending additional unsecured credit. The additional credit which was extended by the suppliers would then be subject to the security interest in inventory and accounts which the secured parties had already obtained."

**27.** A copy of the memorandum is attached to the Motion for Leave to File Supplemental Affidavit in Support of Defendants' Motion for Summary Judgment (doc 50).

time to be changing its effect.[28] Presumably Defendants raise this argument now in light of case law which says that the only defenses which they can raise to the § 547(b) actions are enumerated in § 547(c).[29] Conceding for purposes of argument the factual allegations of DPI and ConAgra, and without in any way discounting the beneficent motivations that DPI ascribes to the prepetition trade creditors, the fact is that all the parties, including the prepetition debtor, were taking the steps that they thought best protected their interests and allowed them to continue doing business. For the Trustee, those actions included settling with the Lenders with notice to the creditors of the estate. Aside from the fact that Defendants' arguments do not go to the standing of the Trustee to bring these actions in any event, Defendants' claims of more cosmic or strategic unfairness are not cognizable under the Code. Without an allegation of some specific fraud or similar misbehavior on the part of the prepetition debtor, the Trustee or the Lenders on which the trade creditors justifiably or reasonably relied to their detriment, the Court can only deal with smaller discrete types of unfairness so designated by Congress, such as preferences and fraudulent transfers.

## Conclusion:

The prohibition against the Trustee being a "mere conduit"[30] for the secured creditors might apply if the Trustee (estate) did not get anything from the successful prosecution of these avoidances. But the Trustee should be allowed to collect not only directly for the estate, but also to repay a secured creditor for money advanced before or after the collection action. The result would be exactly the same if the Lenders' claims were administrative expenses that had to be repaid first, and in fact, that is what paragraph 7 of the settlement agreement makes those expenses if they need to be. And it has to be the Trustee bringing these actions because that is what the wording of the statute requires.

Orders will be entered denying the motions to dismiss for lack of standing under § 550(a).

28. *E.g.,* Supplement to the Trustee's Response to [Wisconsin's Finest's] Motion for Summary Judgment on the Standing Issue, at 6–8 (doc 33).

29. The only defenses to recovery of a preferential transfer are listed in section 547(c). Courts may not create new exceptions to section 547(b). *In re Enserv Co.,* 64 B.R. at 520 (*citing Waldschmidt v. Ranier (In re Fulghum Const. Corp.),* 706 F.2d 171, 173 (6th Cir. 1983).)

30. *Pearson Industries,* 178 B.R. at 761.